Alani PAHULU, Plaintiff,

v.

UNIVERSITY OF KANSAS, Robert Hemenway, Robert Frederick, Kansas University Athletic Corporation, Defendants.

Civ. A. No. 95–2321–GTV.

United States District Court,
D. Kansas.

Aug. 29, 1995.

William J. Skepnek, Winton A. Winter, Jr., Michael J. Maddox, Stevens, Brand, Golden, Winter & Skepnek, Lawrence, KS, for Alani Pahulu.

Karen A. Dutcher, University of Kansas, Office of the General Counsel, Lawrence, KS, for University of Kansas, Robert Hemenway, Robert Frederick.

David J. Waxse, Shook, Hardy & Bacon, Overland Park, KS, for Kansas University Athletic Corporation.

## MEMORANDUM AND ORDER

VAN BEBBER, Chief Judge.

This case is before the court upon plaintiff Alani Pahulu's motion for preliminary injunction (Doc. 18). A hearing was conducted on August 21, 1995, and the court informed counsel of its decision to deny the motion on August 23, 1995. The court now issues this memorandum and order to memorialize the ruling.

### Background

The plaintiff is the recipient of an athletic scholarship to play football at the University of Kansas (KU). During a Spring 1994 football scrimmage, the plaintiff suffered a hit to the head during a tackle. He briefly was dazed, experiencing numbness and tingling in his arms and legs. The doctors described this episode as transient quadriplegia. Although Pahulu left the field on his own, he was not allowed to return to the scrimmage.

A team physician subsequently examined Pahulu and discovered the plaintiff has a congenitally narrow cervical canal. In consultation with a neurosurgeon associated with the KU Medical Center, the team physician concluded, based upon Pahulu's "one previous episode of transient quadriplegia and markedly stenotic cervical canal[, Pahulu] is at extremely high risk for subsequent and potentially permanent severe neurological injury including permanent quadriplegia." (Ex. 3.) Thus, the team physician disqualified the plaintiff from participation in intercollegiate football.

Because he felt fine, Pahulu and his parents sought second opinions on the severity of his condition and on the prohibition against participating in intercollegiate football. The plaintiff saw three specialists, whose consensus was that the plaintiff could participate in intercollegiate football with no more risk of permanent paralysis than any other player.

Pahulu shared this information with the team physician. The plaintiff also offered to release and indemnify the defendants from

liability should he be injured. The team physician and consulting neurosurgeon, although acknowledging their decision was conservative, remained firm in barring the plaintiff from further intercollegiate football competition based upon their belief the plaintiff was at great risk for severe injury. The defendants adhered to this decision.

Alleging a violation of Section 504 of the Rehabilitation Act of 1973,[1] Pahulu filed suit against KU; Robert Hemenway, Chancellor; Robert Frederick, Athletic Director; and the Kansas University Athletic Corporation. The defendants filed motions to dismiss, which the court denied orally on August 18, 1995. Subsequent to the filing of the dismissal motions, the plaintiff filed a motion for preliminary injunction, which is the subject of this memorandum and order.

## Discussion

In order to obtain preliminary injunctive relief, the moving party must establish:

(1) the movant will suffer irreparable injury unless the injunction issues;

(2) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party;

(3) that the injunction, if issued, would not be adverse to the public interest; and

(4) substantial likelihood that the movant will succeed on the merits.

We have adopted a modified likelihood of success requirement in the Tenth Circuit. If the movant has satisfied the first three requirements for a preliminary injunction, the movant may establish likelihood of success by showing questions going to the merits so serious, substantial, difficult and doubtful, as to make the issues ripe for litigation and deserving of more deliberate investigation.

*Walmer v. United States Dep't of Defense*, 52 F.3d 851, 854 (10th Cir.1995) (citations omitted).

At the hearing, Pahulu established that he is entering his last year of eligibility to play intercollegiate football. It is unlikely he could obtain a waiver for an additional year of eligibility from the NCAA. If injunctive relief is not granted, the irreparable harm he will suffer is losing that year of eligibility and the reduced opportunity for a professional sports career.

The defendants argued in their briefs that should Pahulu be injured, the defendants risk damage to their reputation. Robert Frederick, a named defendant, acknowledged at the hearing that the defendants will suffer no foreseeable harm if the preliminary injunction is granted.

The parties do not develop the public interest argument, and no evidence at the hearing suggested injunctive relief would have such an effect. An argument could be made that granting injunctive relief would inject judicial scrutiny into an area best reserved to the coach and the university. In this case, however, injunctive relief would not be subjecting "a coach's discretionary decisions regarding who plays in games and how much playing time is received" to judicial scrutiny. Matthew J. Mitten, *Sports Participation by "Handicapped" Athletes,* 10–SPG Ent. & Sports Law. 15 (1992) (page references not available on Westlaw). The plaintiff seeks the opportunity to earn a playing position; he does not ask this court to direct the defendants to play him.

■ It appears an injunction would not be adverse to the public interest. Consequently, the plaintiff only has to satisfy a modified likelihood of success on the merits.

In order to succeed on the merits, Pahulu must establish a prima facie claim under Section 504 of the Rehabilitation Act, which sets forth the following elements:

(1) he is "disabled" within the meaning of the statute;

(2) he is "otherwise qualified" to participate in the activity or program in question;

(3) he was excluded from the activity or program solely on the basis on his disability; and

(4) the activity or program receives federal funding.

**1.** Initially, Pahulu also brought a claim pursuant to 42 U.S.C. § 1983, which he subsequently dropped. The plaintiff raised state law claims of estoppel and reliance as well.

See 29 U.S.C. § 794; *Eivins v. Adventist Health Sys./Eastern & Middle Am., Inc.,* 651 F.Supp. 340, 341 (D.Kan.1987). Elements three and four are not at issue.

Before discussing elements one and two, the standard of review in a Rehabilitation Act case is worth examining. In *Pushkin v. Regents of Univ. of Colo.,* 658 F.2d 1372, 1383–84 (10th Cir.1981), the Tenth Circuit Court of Appeals explained:

> The rational basis test is not applicable where there is an alleged violation of a statute, § 504, which prohibits discrimination on the basis of handicap. The statute by its very terms does not provide that a recipient of federal financial assistance may act in an unreasonable manner to promote legitimate government means, even if discrimination should be the result. Rather, the statute provides that a recipient of federal financial assistance may not discriminate on the basis of handicap, regardless of whether there is a rational basis for so discriminating. The inquiry has to be on whether the University has, in fact, discriminated on the basis of handicap. The mere fact that the University acted in a rational manner is no defense to an act of discrimination. Thus, while application of the rational basis test may be used to lend credence to the proposition that no discriminatory action has been taken, a finding of rational behavior on the part of the University is only the start of our search to determine whether the mandate of § 504 has been followed.
>
> . . . .
>
> The standards for determining the merits of a case under § 504 are contained in the statute.

The *Pushkin* court also clarified which party has what burden:

> 1) The plaintiff must establish a prima facie case by showing that he was an otherwise qualified handicapped person apart from his handicap, and was rejected under circumstances which gave rise to the inference that his rejection was based solely upon his handicap;
>
> 2) Once plaintiff establishes his prima facie case, defendants have the burden of going forward and proving that plaintiff was not an otherwise qualified handicapped person, that is one who is able to meet all of the program's requirements in spite of his handicap, or that his rejection from the program was for reasons other than his handicap;
>
> 3) The plaintiff then has the burden of going forward with rebuttal evidence showing that the defendants' reasons for rejecting the plaintiff are based on misconceptions or unfounded factual conclusions, and that reasons articulated for the rejection other than the handicap encompass unjustified consideration of the handicap itself.

*Id.* at 1387.

■ The Rehabilitation Act defines an "individual with a disability," previously referred to as handicap, as "any person who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment." 29 U.S.C. § 706(8)(B). The Tenth Circuit has construed this statute to require two elements: "first, that one has, has a record of having, or is regarded as having a physical or mental impairment; and second, that that impairment substantially limits one or more major life activities." *Welsh v. City of Tulsa, Okla.,* 977 F.2d 1415, 1417 (10th Cir.1992). "Plaintiff's status as a disabled individual is a highly fact-sensitive issue, requiring an individualized inquiry and case-by-case determination." *Dutton v. Johnson County Bd. of County Comm'rs,* 859 F.Supp. 498, 506 (D.Kan.1994).

■ Here, there is no question the defendants regard the plaintiff's "congenitally narrow cervical canal" as a physical impairment. The defendants, however, contend that playing intercollegiate football is not a major life activity and that exclusion from such is not a substantial limitation on a major life activity.

Citing "common sense" and federal regulations, the defendants argue that intercollegiate football is not a major life activity. *See* 45 C.F.R. § 84.3(j)(2)(ii) (1994) ("Major life activities means functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learn-

ing, and working."). The defendants then cite cases in which courts have found participation in sports is not a major life activity. *See Scharff v. Frank,* 791 F.Supp. 182, 184 (S.D.Ohio 1991) ("The plaintiff's inability to engage in competitive sporting events and other unusually demanding physical activities did not constitute a substantial impairment of the plaintiff's major life activities."); *see also Stone v. Entergy Serv., Inc.,* 1995 WL 368473, (E.D.La.1995); *Taylor v. United States Postal Serv.,* 771 F.Supp. 882 (S.D.Ohio 1990), *rev'd on other grounds,* 946 F.2d 1214 (6th Cir.1991). These cases dealt with employment disability discrimination in which the sports participation discussed was purely recreational. The plaintiffs in the cases were not involved in college athletics.

The defendants suggest the plaintiff will contend that intercollegiate athletics comes within the purview of "working," an enumerated major life activity. Some courts and commentators have found otherwise. Some have concluded athletics comes within the purview of "learning," another enumerated major life activity, and others have implied athletics in and of itself is a major life activity for certain individuals. The major life activities enumerated at 45 C.F.R. § 84.3(j)(2)(ii) are not an all inclusive list.

In *Sandison v. Michigan High Sch. Athletic Ass'n, Inc.,* 863 F.Supp. 483 (E.D.Mich. 1994), the plaintiffs were high school seniors who were not allowed to participate in field and track because they had surpassed the age limit. The plaintiffs had been held back in school because of learning disabilities, which the court found qualified as disabilities under the Rehabilitation Act and the Americans with Disabilities Act (ADA). The court rejected the defendant's argument that participating in interscholastic sports was not a major life activity, reasoning:

> Defendant downgrades the importance of interscholastic sports in plaintiffs' learning programs. Sandison has better grades as a result of his involvement on the cross-country and track teams and attributes his improved performance to his interaction with his cross-county and track teammates who encourage him to study and to be disciplined.... Stanley has improved so-

cial relationships as a result of his participation on the cross-country and track teams.... Because participation on the cross-country and track team is an important and integral part of the education of plaintiffs, it is as to them a major life activity.

*Id.* at 489; *see University Interscholastic League v. Buchanan,* 848 S.W.2d 298 (Tx.Ct. App.1993) (learning disabled plaintiffs were 19–years–old at beginning of senior year because they had repeated grades; plaintiffs disqualified from athletic competition because of rule prohibiting participation of students over 19–years–old; learning disabilities qualified as disability as Rehabilitation Act; permanent injunction against over–19 rule upheld; allowing no exceptions to over–19 rule failed to reasonably accommodate plaintiffs).

In *Doe v. Dolton Elementary Sch. Dist. No. 148,* 694 F.Supp. 440, 445 (N.D.Ill.1988), a case involving an elementary student with AIDS, the court suggested contact sports were a major life activity for the plaintiff.

In *Wright v. Columbia Univ.,* 520 F.Supp. 789 (E.D.Pa.1981), the court granted the plaintiff, who had sight in only one eye, a temporary restraining order against the university, which had barred the plaintiff's participation in intercollegiate football. Whether the plaintiff was disabled was not at issue; however, the court noted that other "courts have enjoined high schools from preventing students with various handicaps from participating in sports programs." *Id.* at 792.

"The importance of physical education and participation in athletic activities on American college campuses is commonly accepted.... Intercollegiate, club, or intramural sports sponsored by the college must also allow participation by disabled students on a nondiscriminatory basis." Laura F. Rothstein, *Disabilities and the Law* § 7.11 (1992); *see Swann v. Charlotte–Mecklenburg Bd. of Educ.,* 402 U.S. 1, 18, 91 S.Ct. 1267, 1277, 28 L.Ed.2d 554 (1971) (in context of racial integration and enforcement of Title IV, Court recognized athletics as part of educational process); *Brenden v. Independent Sch. Dist. 742,* 477 F.2d 1292, 1298 (8th Cir.1973) ("Discrimination in high school interscholastic ath-

letics constitutes discrimination in education."); Timothy M. Cook & Frank J. Laski, *Beyond Davis: Equality of Opportunity for Higher Education for Disabled Students under the Rehabilitation Act of 1973,* 15 Harv.C.R.–C.L.L.Rev. 415, 459 (1980) ("In evaluating the equality of education opportunity in ... cases [addressing racial integration in higher education], the Court has valued the *social* experience of higher education as much as it has the academic process. Similarly, the ... regulation guarantees disabled students the often intangible benefits of nonacademic social interaction. The provision of physical education and athletic programs, housing, counseling services and financial assistance is particularly important."); *see* 34 C.F.R. § 104.47; 45 C.F.R. § 84.47. "Athletics constitute a 'major life activity' for many people." Matthew J. Mitten, *Sports Participation by "Handicapped" Athletes,* 10–SPG Ent. & Sports Law. 15 (1992) (page references not available on Westlaw); *see* Matthew J. Mitten, *AIDS and Athletics,* 3 Seton Hall J. Sport L. 5 (1993) ("Handicapped athletes have obtained judicial orders under the Rehabilitation Act requiring schools to permit them to participate in team sports.") (page references not available on Westlaw).

The plaintiff contends that whether intercollegiate football participation is a major life activity is a subjective determination. In other words, the question is whether playing college football is a major life activity for him, not whether it is in general. *See* 29 U.S.C. § 706(8)(B) ("of *such person's* major life activities") (emphasis added).

The defendants challenge the subjective determination test. Relying upon regulations implementing the equal employment provisions of the ADA, the defendants emphasize that the major life activity must pertain to the general public.

(1) The term *substantially limits* means:

(i) Unable to perform a major life activity that the average person in the general population can perform; or

(ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

. . . .

(3) With respect to the major life activity of *working*—

(i) The term *substantially limits* means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

29 C.F.R. § 1630.2(j) (1994); *see Welsh v. City of Tulsa, Okla.,* 977 F.2d 1415, 1417 (10th Cir.1992) ("While the regulations define a major life activity to include working, this does not necessarily mean working at the job of one's choice."). The defendants conclude that because the general population cannot play intercollegiate football, the activity is not a major life activity.

■ The case at bar does not involve employment disability discrimination; thus, the regulations found at 29 C.F.R. § 1630 are not applicable. Pursuant to the Rehabilitation Act, the Department of Education and the Department of Health and Human Services have promulgated regulations. *See* 34 C.F.R. § 104 (1994); 45 C.F.R. § 84 (1994); Matthew J. Mitten, *Amateur Athletes with Handicaps or Physical Abnormalities: Who Makes the Participation Decision,* 71 Neb. L.Rev. 987 (1992). Although all three sets of regulations contain the same definition of "major life activities," *see* 29 C.F.R. § 1630.2(i); 34 C.F.R. § 104.3(j)(2)(ii); 45 C.F.R. § 84.3(j)(2)(ii), the regulations promulgated pursuant to the Rehabilitation Act do not define "substantial limitation." This is not an oversight. In commentary following the regulations, both the Department of Education and the Department of Health and Human Services acknowledge "the lack of any definition in the proposed regulation of the phrase 'substantially limits.' The Department does not believe that a definition of this term is possible at this time." 34 C.F.R.

§ 104, App. A at 372; 84 C.F.R. § 84, App. A at 355.

Cases in which the regulations promulgated pursuant to the Rehabilitation Act or the ADA are applied interchangeably are in the context of employment discrimination. *See, e.g., McGee v. Rice,* 21 F.3d 1121 (10th Cir. 1994) (unpublished); *Chandler v. City of Dallas,* 2 F.3d 1385, 1391 (5th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1386, 128 L.Ed.2d 61 (1994); *Farley v. Gibson Container, Inc.,* 891 F.Supp. 322, 325 n. 1 (N.D.Miss.1995); *Dutton,* 859 F.Supp. at 504. The regulations that implement the equal employment provisions of the ADA authorize usage of the regulations that federal agencies have issued pursuant to the Rehabilitation Act. 29 C.F.R. § 1630.1(c)(1); *see* 42 U.S.C. 12117(b) ("The agencies with enforcement authority for actions which allege employment discrimination under the subchapter and under the Rehabilitation Act of 1973 ... shall develop procedures to ensure that administrative complaints filed under this subchapter and under the Rehabilitation Act of 1973 ... are dealt with in a manner that avoids duplication of effort and prevents imposition of inconsistent or conflicting standards for the same requirements under this subchapter and the Rehabilitation Act."). The court is cited no authority for the proposition that the Rehabilitation Act or regulations promulgated pursuant thereof authorize reliance upon ADA regulations in all Rehabilitation Act contexts.

■ There is additional authority for finding that intercollegiate athletics can be a major life activity. The regulations promulgated pursuant to the Rehabilitation Act prohibit universities from discriminating against qualified disabled athletes who are to have "an equal opportunity for participation" in intercollegiate athletics. 34 C.F.R. § 104.47(a); 45 C.F.R. § 84.47(a). The defendants argue that these regulations only apply after it is determined the individual is disabled and qualified. The court disagrees.

■ The court's attention also is directed to the policy interpretation concerning contact sports issued in 1978 by the Office for Civil Rights of the Department of Health, Education, and Welfare, which provides in pertinent part:

> *Policy Interpretation:* Students who have lost an organ, limb, or appendage but who are otherwise qualified may not be excluded by recipients from contact sports. However, such students may be required to obtain parental consent and approval for participation from the doctor most familiar with their condition.

Although the policy interpretation addresses minor students, coverage of the policy interpretation applies to any recipient of federal funding. *See* Cathy J. Jones, *College Athletes: Illness or Injury and the Decision to Return to Play,* 40 Buff.L.Rev. 113, 215 n. 312 (1992).

Pahulu testified that through playing football, he has learned to be a team player; he has learned discipline; he has met people and been inspired to want a better life for himself; he has learned to care about his appearance; and his grades improved once he started playing football. The plaintiff's father testified to the educational and growth benefits his son has derived from participating in sports, particularly football. Defendant Frederick and Coach Glen Mason both testified that athletics is an important component of learning.

Thus, this court finds that for Pahulu, intercollegiate football may be a major life activity, i.e., learning. The defendants' action, however, is not a substantial limitation upon the plaintiff's opportunity to learn. For example, Pahulu's athletic scholarship continues, giving him access to all academic services available before his disqualification from competition. The plaintiff also has the opportunity to participate in the football program in a role other than as a player. Additionally, there are a myriad of other educational opportunities available to Pahulu at KU. Consequently, Pahulu is not disabled within the meaning of the Rehabilitation Act.

■ Even if the plaintiff is disabled, he is not otherwise qualified. Under the pertinent regulatory definition, a qualified disabled person, "[w]ith respect to postsecondary and vocational education services, [is] a handicapped person who meets the academic and

technical standards requisite to admission or participation in the recipient's education program or activity." 34 C.F.R. § 104.3(k)(3); 45 C.F.R. § 84.3(k)(3). "The term *technical standards* refers to all nonacademic admissions criteria that are essential to participation in the program in question." 34 C.F.R. § 104, App. A at 374; 45 C.F.R. § 84, App. A at 357. According to the Supreme Court, "[a]n otherwise qualified person is one who is able to meet all of a program's requirements in spite of his handicap." *Southeastern Community College v. Davis,* 442 U.S. 397, 406, 99 S.Ct. 2361, 2367, 60 L.Ed.2d 980 (1979). Whether a person is "otherwise qualified" under the Rehabilitation Act primarily is a factual inquiry. *McGee v. Rice,* 21 F.3d 1121 (10th Cir.1994) (unpublished).

KU recruited Pahulu and gave him an athletic scholarship to play at the university. The plaintiff was a competitive player on the spring 1994 football squad; he played defensive tackle/lineman. There is no evidence to the contrary. Thus, prior to discovery of his impairment, the defendants considered Pahulu qualified. Pahulu does not believe he is physically disabled, only that the defendants regard him as such.

 The defendants have the burden of showing Pahulu is not an otherwise qualified disabled person. In other words, the defendants must show the plaintiff is not able to meet the program's requirements in spite of his disability. The defendants argue that Pahulu must satisfy the program's requirements, *e.g.,* medical clearance for participation, in order to be otherwise qualified.

As rebuttal, the plaintiff offered the opinion of three specialists that he should be cleared to play football and that his risk of permanent injury is no greater than any other player's risk. Pahulu attempted to show that the defendants' basis for disqualifying him was based upon misconceptions or unfounded factual conclusions.

The court finds that the conclusion of the KU physicians, although conservative, is reasonable and rational. Thus, the defendants' decision regarding disqualification has a rational and reasonable basis and is supported by substantial competent evidence for which the court is unwilling to substitute its judgment.

IT IS, THEREFORE, BY THE COURT ORDERED that plaintiff Alani Pahulu's motion for preliminary injunction (Doc. 18) is denied.

Copies of this order shall be mailed to counsel of record for the parties.

**IT IS SO ORDERED.**