Nicholas KNAPP, Plaintiff,

v.

NORTHWESTERN UNIVERSITY, an Illinois not-for-profit corporation, and Rick Taylor, Defendants.

No. 95 C 6454.

United States District Court,
N.D. Illinois,
Eastern Division.

Sept. 13, 1996.

Eldon L. Ham, Northbrook, IL, Robert Andrew Chapman, Chicago, IL, for plaintiff.

Eric F. Quandt, Julian Solotorovsky, Kelley, Drye & Warren, Chicago, IL, Amy D. Mayber, Chicago, IL, Andrea A. Goldberg, Abbott Park, IL, for defendants.

## MEMORANDUM OPINION AND ORDER

ZAGEL, District Judge.

On September 19, 1994, Knapp's heart stopped and he collapsed following a pick-up basketball game in his high school gym. Knapp was revived by paramedics using cardiopulmonary resuscitation and electronic defibrillation. Knapp was then hospitalized and diagnosed as having suffered sudden cardiac death caused by primary ventricular fibrillation. Knapp claims he suffered a ventricular fibrillation following an episode of syncope. On October 3, 1994, Knapp had an automatic cardioverter defibrillator implanted in his abdomen to attempt to restart his heart in the event of another cardiac arrest. The defibrillator's purpose is to recognize certain heart arrhythmias and provide programmed therapy to restore any such heart arrhythmias to normal.

On November 9, 1994, Knapp signed a National Letter of Intent to attend Northwestern on an athletic scholarship to play basketball. Northwestern was aware of Knapp's heart condition at the time of the signing. When Knapp began Northwestern in the fall of 1995, Dr. Howard Sweeney, the head physician for Northwestern's Basketball team, concluded that Knapp was not medically eligible to participate in intercollegiate basketball based upon Knapp's medical records, published medical guidelines, and recommendations of other physicians he consulted. Knapp continues to be a member of the team and continues to receive his scholarship, but he is not able to practice or compete with the team. Knapp wishes to play basketball for Northwestern and sues under the Rehabilitation Act.

At a hearing in this Court on September 6, 1996, four cardiologists testified as to Knapp's condition and his risk of future injury. They were evenly split on their conclusions as to whether he might play, but they were largely in agreement on the substance of the medical science applicable to Nicholas Knapp and his heart.

### Rehabilitation Act

Section 504(a) of the Rehabilitation Act of 1973 protects "otherwise qualified individuals" from discrimination on account of disability. The purpose of the Act is to provide an "even handed treatment of qualified handicapped persons" and to prevent discrimination based on a perceived "inability to function in a particular context." In order to make out a prima facie case of discrimination under the Rehabilitation Act, Knapp must demonstrate that (1) he is a "disabled" individual within the meaning of the Act, (2) he is "otherwise qualified" for the position sought, (3) he is excluded from the position solely because of the disability, and (4) the position from which he is excluded is part of a federally funded program.

In deciding a case under the Rehabilitation Act the rational basis test is not applicable. The statute by its very terms does not provide that a recipient of federal financial assistance may discriminate against an individual on the basis of a handicap, even if there is a rational basis for so discriminating. The inquiry is whether the University has, in fact, discriminated on the basis of handicap.

Northwestern admits that it receives federal financial assistance and that it has disqualified Knapp from playing solely because of his cardiovascular impairment. Thus, the only remaining issues are whether Knapp is "disabled" within the meaning of the statute and whether he is "otherwise qualified" to play intercollegiate basketball.

(1) The Rehabilitation Act defines a "disabled" individual as a person who has a physical impairment that substantially limits

one or more of his major life activities. Whether a person is "disabled" within the meaning of the Act is a highly fact-sensitive question. There is no question that Northwestern regards Knapp as having a permanent cardiovascular impairment constituting a physical impairment under the Act. However, Northwestern argues that intercollegiate basketball is not a "substantial life activity" and that Knapp has not been "substantially limited" in participating in the sport.

(a) The district courts, and these are the only courts that have addressed the issues, are split over whether participation in sports is a "major life activity." *See Pahulu v. University of Kansas,* 897 F.Supp. 1387 (D.Kan.1995). The federal regulations define "major life activities" as "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." What constitutes a major life activity must be determined on an individual basis, so a plaintiff need only prove that a particular function is a major life activity as to him.

Intercollegiate sports play a major role in a student's education and learning process. This has been recognized by several courts that have found physical education and participation in athletic activities on college campuses to be an important part of the educational process. The regulations promulgated pursuant to the Rehabilitation Act support this viewpoint by prohibiting universities from discriminating against qualified disabled athletes who are to have an equal opportunity for participation in intercollegiate athletics. The regulations specifically state that "[i]n providing ... athletics ... to any of its students, a recipient to which this subpart applies may not discriminate on the basis of handicap. A recipient that offers ... intercollegiate ... athletics shall provide to qualified handicapped students an equal opportunity for participation in these activities." 34 C.F.R. § 104.47.

■ While the issue is not free from doubt, I find that intercollegiate sports competition may constitute a major life activity. I find, without doubt, that it is for Nicholas Knapp. It is clear that competitive basket-ball has played a substantial role in Knapp's education and learning process as he has learned valuable life skills and character traits. As Knapp stated in his affidavit, "[m]y participation in competitive basketball has provided me and could continue to provide me with a unique experience that I have not encountered in any other extracurricular activity in which I have been involved or in which I could possibly become involved. Among other things, competitive basketball has helped to instill in me the following character traits: confidence, dedication, leadership, teamwork, discipline, perseverance, patience, the ability to set priorities, the ability to compete, goal-setting and the ability to take coaching, direction and criticism.... Competitive basketball has also given me recognition in the community, and provided me with the opportunity to meet new people.... Competitive basketball has also supplied me with a meaningful outlet for intense physical exercise and an enjoyment and happiness that cannot be duplicated in an open gym or intramural setting." Because competitive basketball is an important and integral part of Knapp's education and learning experience, I find that intercollegiate basketball is a major life activity for him.

■ (b) Northwestern argues that exclusion from participation in a single extracurricular activity is not a substantial limitation because he can engage in other activities that would provide him with the same educational benefits such as playing an instrument in the school band or orchestra. I do not disagree that participation in the band or orchestra may give a student who has trained for years on a particular instrument an educational experience similar to that of intercollegiate athletics. However, the law is not satisfied by telling a student who has trained for years to play basketball that the student can now play in the school band or orchestra instead and receive the same educational experience. It also undermines the purpose of the Rehabilitation Act not to allow a disabled individual to pursue his chosen field perhaps (particularly so when that field is chosen without knowing of the disability). Furthermore, there are relatively few, if any, activities that demand the same level of teamwork,

precision and discipline as an intercollegiate sport to which a person can transfer particular skills.[1]  For this reason, it would probably not be enough for Northwestern to say that Knapp would be permitted to play baseball or golf.[2]

Northwestern also argues that because Knapp continues to receive his scholarship, still has a role with the team, and is given access to all the benefits given other team members except the ability to play, he is not "substantially limited." Northwestern misses the mark.  It is the activity of practice and competition that constitutes a large part of the learning experience for Knapp.  Being able to attend games and travel with the team does not make up for not being able to practice with the team and have a reasonable chance to play in games.  It is the playing of basketball that teaches discipline, teamwork, and perseverance.  These traits are not developed by being a perpetual observer.  The fact that Northwestern will not allow Knapp to play constitutes a substantial limitation on his ability to play intercollegiate basketball.

■ (2) Knapp must next prove that he is "otherwise qualified" to play intercollegiate basketball at Northwestern.  In other words, Knapp must be able to meet all of the program's requirements in spite of his handicap.  The parties agree that an individual is not qualified if there is a genuine substantial risk that he or she could be injured or could injure others.  When making this determination, whether the risk of injury is substantial, a court must be careful not to undermine the policy of the Rehabilitation Act by letting remote concerns legitimize discrimination. "Any qualification based on risk of future injury must be examined with special care if the Rehabilitation Act is not to be circumvented easily, since almost all handicapped persons are at a greater risk [of injury]." *Bentivegna v. U.S. Dept. of Labor,* 694 F.2d 619, 622 (9th Cir.1982).  Thus, this case turns on whether the risk of injury, death, to

Knapp of playing intercollegiate basketball is *substantial.*

I find the risk of injury to Knapp is not substantial based on the testimony of the four cardiologists who testified at the hearing.  Dr. McAnulty testified that the risk of death for individuals that have experienced ventricular fibrillation and sudden death goes down after the first year.  Doctors Zipes and Maron testified that the risk is not time dependent, but they conceded that most recurrences happen within the first year.  It is now nearly two years to the day that Knapp's heart went into ventricular fibrillation.  Knapp has not had a repeat episode or displayed any symptoms.  In addition, Knapp's latest echo-cardiogram showed no problems as compared to his previous echo-cardiograms.  This is all in light of the fact that Knapp has continued to play basketball on a competitive level for more than the past year in addition to lifting weights, jogging and sprinting.  Had this hearing been conducted more than a year ago, I would have found at that time that the risk of injury to Knapp was substantial.  However, the passage of time, as testified to by the cardiologists, is a factor.  Knapp has been asymptomatic for two years.  The cardiologists agree that the chance Knapp will experience a second event while playing intercollegiate basketball in the first place is low and two of them whom I credit agree that this risk has decreased with the passage of more than one year.  In addition, the cardiologists agree that the chance the implantable cardioverter defibrillator will not work to restore a normal heart beat in the event Knapp does experience a second event is slight.  While some people might find that a 1 in 1,000 or even a 1 in 1,000,000 chance of dying is too much, the Rehabilitation Act requires that remote or minimal risks not be used to legitimize discrimination.  While the determinations of risk were admittedly made without a reasonable degree of medical certainty, since very little data exists regarding ventricular fibrillation and implantable cardioverter defibrillator and none

---

1.  I might be willing to find that an athlete who plays both intercollegiate football and baseball is not substantially limited if he is disqualified from only football, but that is not the case here.

2.  The Bethesda Conference classified Basketball as having moderate static and high dynamic demands.  Baseball as having low static and moderate dynamic demands and golf as having low static and low dynamic demands.

exists regarding intercollegiate athletes in such situations, I find the risk to Knapp is not substantial after the passage of two years without any symptoms. In making this decision, I did not consider the testimony of Dr. Rink who testified to his reevaluation of the cause of Knapp's sudden death in September 1994.

I therefore find that Northwestern's reasons for excluding Nicholas Knapp from playing intercollegiate basketball violate the Rehabilitation Act.[3] This decision does not state an opinion on whether Northwestern can require Knapp or potential survivors to sign a waiver of liability. It may well have a right to insist on waiver, a right arising from other sources of law. Ordinarily, a plaintiff neither increases nor decreases rights under the Rehabilitation Act by signing or refusing a waiver although waivers may be relevant to reasonableness of accommodation. Nor does it decide whether Northwestern may require a current showing on Knapp's fitness to play on grounds other than the suitability of his cardiac condition. I have only concluded that Northwestern's basis for determining Knapp ineligible to play thus far is insufficient.

■ (3) To complete the analysis I must evaluate the balance of harms and public interest. The harm to Northwestern if Knapp is able to play basketball is substantial but quite contingent. It is the extremely slight risk that Knapp may harm another player if he receives a shock from his implantable defibrillator and the harm that Northwestern would suffer as an institution if a student wearing a Northwestern jersey were to collapse and die on the basketball court. The harm could include not only the general harm to its university reputation but also is its ability to recruit good student athletes. The harm to Knapp if he is unable to play is substantial and certain. Playing intercollegiate basketball is a major life activity for him and his inability to play would curtail his ability to live his life fully and end his chances, however speculative, of a profes-

sional basketball career. Knapp does not consider the risk of death to himself to constitute a harm as he is willing to assume that risk. I therefore find that the balance of harms weighs in favor of Nicholas Knapp as the injury to him would be irreparable. I find there are arguments for the public interest of equal weight on both sides. The public interest does not preclude issuance of the injunction. Finally, Northwestern must provide Knapp with a reasonable accommodation when he plays. This means here there must be a defibrillator at courtside and a trained person who can operate it at all times when Knapp is practicing and competing in games.

*Conclusion*

The injunction is granted.

---

**3.** Hardly a year goes by that there is not at least one instance of the tragic death of a healthy youth as a result of competitive sports activity. Life has risks. Thus purpose of S 504, however, is to permit handicapped individuals to live life as fully as they are able, without paternalistic authorities deciding that certain activities are too risky for them." *Poole v. South Plainfield Bd. of Ed.*, 490 F.Supp. 948, 953–54 (D.N.J.1980).