**Nicholas KNAPP, Plaintiff,**

**v.**

**NORTHWESTERN UNIVERSITY, an Illinois not-for-profit corporation, and Rick Taylor, Defendants.**

**No. 95 C 6454.**

United States District Court,
N.D. Illinois,
Eastern Division.

Oct. 7, 1996.

Eldon L. Ham, Northbrook, IL, Robert Andrew Chapman, Chicago, IL, for Nicholas Knapp.

Eric F. Quandt, Julian Solotorovsky, Kelley, Drye & Warren, Chicago, IL, Amy D. Mayber, Northwestern University, Chicago, IL, Andrea A. Goldberg, Abbott Laboratories, Abbott Park, IL, for Northwestern University, Richard Taylor.

## CONSOLIDATED MEMORANDUM OPINION AND ORDER

ZAGEL, District Judge.

Nicholas Knapp has moved for an injunction that would allow him to play basketball for Northwestern University. Northwestern in turn has moved for summary judgment on Knapp's claim under the Rehabilitation Act. I have already ruled on the merits of these claims in this case in two separate rulings. This is a consolidation of those opinions.

On September 19, 1994, Nicholas Knapp's heart stopped and he collapsed following a pick-up basketball game in his high school gym. Knapp was revived by paramedics using cardiopulmonary resuscitation and electronic defibrillation. Knapp was then hospitalized and diagnosed as having suffered sudden cardiac death caused by primary ventricular fibrillation. Knapp claims he suffered a ventricular fibrillation following an episode of syncope. On October 3, 1994, Knapp had an automatic cardioverter defibrillator implanted in his abdomen to attempt to restart his heart in the event of another cardiac arrest. The defibrillator's purpose is to recognize certain heart ar-

rhythmias and provide programmed therapy to restore any such heart arrhythmias to normal.

On November 9, 1994, Knapp signed a National Letter of Intent to attend Northwestern on an athletic scholarship to play basketball. Northwestern was aware of Knapp's heart condition at the time of the signing. When Knapp began Northwestern in the fall of 1995, Dr. Howard Sweeney, the head physician for Northwestern's basketball team, concluded that Knapp was not medically eligible to participate in intercollegiate basketball based upon Knapp's medical records, published medical guidelines, and recommendations of other physicians he consulted. Knapp continues to be a member of the team and continues to receive his scholarship, but he is not able to practice or compete with the team. Knapp wishes to play basketball for Northwestern and sues under the Rehabilitation Act.

Two hearings were held in this courtroom in which a number of cardiologists testified regarding Knapp's present condition, his risk of future injury and the type of reasonable accommodation necessary. The cardiologists were evenly split on their conclusions as to whether he should play, but they were largely in agreement on the substance of the medical science applicable to Nicholas Knapp and his heart.

### Discussion

A party seeking a permanent injunction must establish that (1) he has succeeded on the merits, (2) no adequate remedy at law exists, (3) irreparable harm will arise absent injunctive relief, (4) the balance of harms favors entry of an injunction, and (5) the entry of the injunction will not harm the public interest. *Smith Barney, Harris Upham & Co., Inc. v. St. Pierre,* 1994 WL 11600, *3 (N.D.Ill.1994).

### Rehabilitation Act

Section 504(a) of the Rehabilitation Act of 1973 protects "otherwise qualified individual[s]" from discrimination on account of disability. 29 U.S.C. § 794(a). The purpose of the Act is to provide even-handed treatment of qualified disabled persons and to prevent discrimination based on a perceived inability to function in a particular context. In order to make out a prima facie case of discrimination under the Rehabilitation Act, Knapp must demonstrate that (1) he is a "disabled" individual, (2) he is "otherwise qualified" for the program sought, (3) he is excluded from the program solely because of the disability, and (4) the program from which he is excluded is part of a federally funded program. *Byrne v. Board of Educ., School of West Allis–West Milwaukee,* 979 F.2d 560, 563 (7th Cir.1992).

In deciding a case under the Rehabilitation Act the rational basis test is not applicable. *Pushkin v. Regents of University of Colorado,* 658 F.2d 1372, 1383–84 (10th Cir. 1981). The statute by its very terms does not provide that a recipient of federal financial assistance may discriminate against an individual on the basis of a handicap, even if there is a rational basis for so discriminating. *Id.* at 1384. The inquiry is whether the University has, in fact, discriminated on the basis of handicap. *Id.*

Northwestern admits that it receives federal financial assistance and that it has disqualified Knapp from playing solely because of his cardiovascular impairment. Thus, the only remaining issues are whether Knapp is "disabled" within the meaning of the statute and whether he is "otherwise qualified" to play intercollegiate basketball.

(1) The Rehabilitation Act defines a "disabled" individual as a person who has a physical impairment that substantially limits one or more of his major life activities. 29 U.S.C. § 706(8)(B). Whether a person is "disabled" within the meaning of the Act should be determined on a case by case basis. *Byrne,* 979 F.2d at 565. There is no question that Northwestern regards Knapp as having a permanent cardiovascular impairment constituting a physical impairment under the Act. However, Northwestern argues that intercollegiate basketball is not a "substantial life activity" and that Knapp has not been "substantially limited" in participating in the sport.

█ (a) The district courts, and these are the only courts that have addressed the issue, are split over whether participation in sports is a "major life activity." *See Pahulu v. University of Kansas,* 897 F.Supp. 1387, 1390–93 (D.Kan.1995); *Doe v. Dolton Elementary School Dist. No. 148,* 694 F.Supp. 440, 445 (N.D.Ill.1988); *cf Scharff v. Frank,* 791 F.Supp. 182, 184 (S.D.Ohio 1991). The federal regulations define "major life activities" as "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 45 C.F.R. § 84.3(j)(2)(ii). What constitutes a major life activity must be determined on an individual basis, so a plaintiff need only prove that a particular function is a major life activity as to him. *Pahulu,* 897 F.Supp. at 1392.

Intercollegiate sports play a major role in a student's education and learning process. This has been recognized by several courts that have found physical education and participation in athletic activities on college campuses to be an important part of the educational process. *See, e.g., Pahulu,* 897 F.Supp. at 1391–92. The regulations promulgated pursuant to the Rehabilitation Act support this viewpoint by prohibiting universities from discriminating against qualified disabled athletes who are to have an equal opportunity for participation in intercollegiate athletics. The regulations specifically state that "[i]n providing ... athletics ... to any of its students, a recipient to which this subpart applies may not discriminate on the basis of handicap. A recipient that offers ... intercollegiate ... athletics shall provide to qualified handicapped students an equal opportunity for participation in these activities." 34 C.F.R. § 104.47(a)(1).

While the issue is not free from doubt, I find that intercollegiate sports competition may constitute a major life activity. I find, without doubt, that it is for Nicholas Knapp. It is clear that competitive basketball has played a substantial role in Knapp's education and learning process as he has learned valuable life skills and character traits. As Knapp stated in his affidavit, "[m]y participation in competitive basketball has provided me and could continue to provide me with a unique experience that I have not encountered in any other extracurricular activity in which I have been involved or in which I could possibly become involved. Among other things, competitive basketball has helped to instill in me the following character traits: confidence, dedication, leadership, teamwork, discipline, perseverance, patience, the ability to set priorities, the ability to compete, goal-setting and the ability to take coaching, direction and criticism.... Competitive basketball has also given me recognition in the community, and provided me with the opportunity to meet new people.... Competitive basketball has also supplied me with a meaningful outlet for intense physical exercise and an enjoyment and happiness that cannot be duplicated in an open gym or intramural setting." Because competitive basketball is an important and integral part of Knapp's education and learning experience, I find that intercollegiate basketball is a major life activity for him.

█ (b) Northwestern argues that exclusion from participation in a single extracurricular activity is not a substantial limitation because he can engage in other activities that would provide him with the same educational benefits such as playing an instrument in the school band or orchestra. I do not disagree that participation in the band or orchestra may give a student who has trained for years on a particular instrument an educational experience similar to that of intercollegiate athletics. However, the law is not satisfied by telling a student who has trained for years to play basketball that the student can now play in the school band or orchestra instead and receive the same educational experience. It also undermines the purpose of the Rehabilitation Act not to allow a disabled individual to pursue his chosen field particularly so when that field is chosen without knowing of the disability. Furthermore, there are relatively few, if any, activities that demand the same level of teamwork, precision and discipline as an intercollegiate sport to which a person can transfer particular skills.[1] For this reason, it would probably

---

1. I might be willing to find that an athlete who plays both intercollegiate football and baseball is

not be enough for Northwestern to say that Knapp would be permitted to play baseball or golf.[2]

Northwestern also argues that because Knapp continues to receive his scholarship, still has a role with the team, and is given access to all the benefits given other team members except the ability to play, he is not "substantially limited." Northwestern misses the mark. It is the activity of practice and competition that constitutes a large part of the learning experience for Knapp. Being able to attend games and travel with the team does not make up for not being able to practice with the team and have a reasonable chance to play in games. It is the playing of basketball that teaches discipline, teamwork, and perseverance. These traits are not developed by being a perpetual observer. The fact that Northwestern will not allow Knapp to play constitutes a substantial limitation on his ability to play intercollegiate basketball.

■■■ (2) Knapp must next prove that he is "otherwise qualified" to play intercollegiate basketball at Northwestern. In other words, Knapp must be able to meet all of the program's requirements in spite of his handicap. The parties agree that an individual is not qualified if there is a genuine substantial risk that he or she could be injured or could injure others. When making this determination, whether the risk of injury is substantial, a court must be careful not to undermine the policy of the Rehabilitation Act by letting remote concerns legitimize discrimination. "Any qualification based on the risk of future injury must be examined with special care if the Rehabilitation Act is not to be circumvented easily, since almost all handicapped persons are at a greater risk [of injury]." *Bentivegna v. U.S. Dept. of Labor*, 694 F.2d 619, 622 (9th Cir.1982). A mere elevation of risk, without more, is insufficient to find that Knapp is not "otherwise qualified." *Mantolete v. Bolger*, 767 F.2d 1416, 1422 (9th Cir. 1985). Thus, this case turns on whether the risk of injury (death) to Knapp of playing

intercollegiate basketball is *substantial.* This determination turns on two issues, whether Knapp has a substantial risk of having a recurrent event of ventricular fibrillation while playing basketball and in the event Knapp does have a second episode, whether the implantable cardioverter defibrillator will work.

First, I find the risk to Knapp of a repeat episode is not substantial based on the testimony of the cardiologists who testified at the hearing. In the course of listening to the testimony, it has become clear that little of the science is in dispute. Drs. McAnulty and Olshansky attempted to quantify the risk of death for individuals that have experienced ventricular fibrillation and sudden death. They stated that the risk of death goes down after the first year. Drs. Zipes and Maron did not significantly disagree. They testified that the risk is not time dependent, but they conceded that most recurrences happen within the first year. Despite this testimony, Dr. Zipes made it clear that there is no data to support the conclusions of Drs. McAnulty and Olshansky. And there is no dispute on this matter because no one has ever studied, nor has there ever been, an individual who has suffered ventricular fibrillation and sudden death, had an automatic defibrillator implanted and continued to play competitive basketball at a Division I level. It is thus clear that the risk to Knapp of experiencing a second event is unquantifiable. Regrettably, unanimous agreement on this gets us nowhere because to decide this case, Congress has required a judicial decision on the substantiality of the risk.

■■■ Where the law requires a decision as to the probable truth of something when the scientific truth of it is unknowable, the decision must generally (but not always) be made even if it is made without what passes for scientific probability. In such cases, we ordinarily erect presumptions. We could take the position that because some risk exists, although its gravity cannot be scientifically

---

not substantially limited if he is disqualified from only football, but that is not the case here.

**2.** The Bethesda Conference classified Basketball as having moderate static and high dynamic de-

mands. Baseball as having low static and moderate dynamic demands and golf as having low static and low dynamic demands.

known, we must presume the risk to be substantial. In other words, in the absence of evidence of safety, we must presume danger. But such a presumption assumes that an individual should not engage in any "unessential" activity that increases one's risk under the circumstances, no matter how great or small. While this opinion, which I attribute to Dr. Zipes' testimony, is clearly rational in the medical profession, it cannot mandate a decision under the law as Congress wrote it.

In this case, there are highly qualified experts in agreement on all the basic scientific principles and differing only in their medical judgment on the final question. The difference of opinion between medical experts in this case is not unusual. Years ago physicians who testified in court often said that medicine was an art and not a science. This is much less true today than it was in the 1960s when I first heard it. *See Mercado v. Ahmed*, 756 F.Supp. 1097, 1101 n. 7 (N.D.Ill.1991). Yet there is still truth in the old saw and it applies to questions like those here where physicians have decades of personal professional experience with heart problems of the sort in this case and not a single scientific study squarely on point to back up their judgments. The judgments may differ but are not worthless or inadmissible for this reason. All the physicians who testified used commonly accepted scientific principles and proven data about the heart and its functioning. All possess the education, training and experience required to become experts and none disputes the expertise of the others. The range of disagreement is extremely narrow, confined only to the dimensions of the risk of recurrence and the effect of the passage of time on that risk. I find that there is nothing in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), or Federal Rule of Evidence 702, that precludes me from considering the views of all the physicians in this case. As such, I must consider the testimony of all the experts who testified and determine which are most persuasive. It is what the trial of disputes such as this will sometimes require. It might have been better to have left the choice to a panel of physicians, but Congress left it with

the courts, and the random assignment of this case has left it here with me.

Weighing the testimony of all the experts, the most persuasive factors in reaching my decision are Knapp's lack of symptoms over the past two years and the evidence that the risk of a repeat episode appears to decrease with time, though this is not scientifically proved. It is now nearly two years to the day that Knapp's heart went into ventricular fibrillation. Knapp has not had a repeat episode or displayed any symptoms. In addition, Knapp's latest echo-cardiogram showed no indicia of concern as compared to his previous echo-cardiograms. All this is in light of the fact that Knapp has continued to play basketball on a competitive level for more than the past year in addition to lifting weights, jogging and sprinting. Had this hearing been conducted more than a year ago, I would have found at that time that the risk of injury to Knapp was substantial. The passage of another year matters here. Knapp has been asymptomatic for two years. The cardiologists agree, despite the lack of data, that the chance Knapp will experience a second event while playing intercollegiate basketball in the first place is either low or unknown and two of them, whom I credit, agree that this risk has decreased with the passage of more than one year.

Second, I find the risk that the implantable cardioverter defibrillator will not work to restore a normal heart beat in the event that Knapp does experience another episode is slight. On this the cardiologists seem to agree. While some people might find that a 1 in 1,000 or even a 1 in 1,000,000 chance of dying is too much, the Rehabilitation Act requires that remote or minimal risks not be used to legitimize discrimination. "Hardly a year goes by that there is not at least one instance of the tragic death of a healthy youth as a result of competitive sports activity. Life has risks. The purpose of s 504, however, is to permit handicapped individuals to live life as fully as they are able, without paternalistic authorities deciding that certain activities are too risky for them." *Poole v. South Plainfield Bd. of Ed.*, 490 F.Supp. 948, 953–54 (D.N.J.1980). I conclude that Northwestern's reasons for ex-

cluding Nicholas Knapp from playing intercollegiate basketball violate the Rehabilitation Act.

■ Turning to the issue of reasonable accommodation, the parties debate the efficacy of having an external defibrillator at Knapp's side during practice, games and for a period of time afterwards and the frequency in which the internal cardiac defibrillator ought to be interrogated to insure it is working properly. Northwestern appears to argue, by use of Dr. Zipes' testimony, that there is no accommodation that would be reasonable. Dr. Zipes testified that an external defibrillator may actually do great harm in the presence of an internal defibrillator when used outside the environs of a medical office or hospital. Dr. Zipes noted that, in any event, the degree to which Knapp's risk would be reduced by the presence of an external defibrillator is unknown. On behalf of Nicholas Knapp, Drs. McAnulty and Olshansky testified that having an external defibrillator at courtside during games would reduce the risk of death to Knapp by some small margin. However, considering the testimony of all present regarding the high reliability of the internal defibrillator and the opinions that there is a small increased benefit, or an unknown benefit or a detriment of using an external defibrillator, it appears to me that Knapp has offered the courtside defibrillator option more as a comfort factor to the Court and perhaps to the University than as an accommodation he believes to be necessary. Considering the credible testimony of all the experts, I am persuaded that the reasonable accommodation is the one that has already been made, that is the implantable defibrillator. I find that an external defibrillator cannot be required as a reasonable accommodation and thus the issue of its cost and reasonableness is moot.

The question of accommodation then shifts to how often the internal defibrillator should be interrogated. Dr. Zipes testified that it should be interrogated after every game, while Dr. Olshansky testified, out of an abundance of caution, that it should be interrogated every two weeks. I accept Dr. Olshansky's opinion here because of Knapp's recent experience of months of physical activity including playing basketball. Thus, the only reasonable accommodation is for Knapp to have his internal defibrillator interrogated biweekly. Since the cost of interrogation has been assumed by Knapp, at least for purposes of injunctive relief, I need not now consider the reasonableness of cost to Northwestern.

In closing I note that if, as a matter of law and fact, all that is required, as *Pahulu v. University of Kansas*, 897 F.Supp. 1387, 1394 (D.Kan.1995) holds, is that Northwestern make a rational decision that Knapp's risk is substantial based on reasonable evidence to which courts must defer, then I find Northwestern has done this.

■ This decision does not state an opinion on whether Northwestern can require Knapp or potential survivors to sign a waiver of liability. It may well have a right to insist on waiver, a right arising from other sources of law. Ordinarily, a plaintiff neither increases nor decreases rights under the Rehabilitation Act by signing or refusing a waiver although waivers may be relevant to reasonableness of accommodation. Nor does this opinion decide whether Northwestern may require a current showing on Knapp's fitness to play on grounds other than the suitability of his cardiac condition. I have only concluded that Northwestern's basis for determining Knapp ineligible to play thus far is insufficient and in violation of the Rehabilitation Act.

■ Having found that Knapp has succeeded on the merits, I turn to the remaining elements of the injunction analysis. It is clear that there is no adequate remedy at law for Knapp in this case. Damages for his injury cannot restore what he has lost, the inability to play with his team and compete. The only remedy for his injury is to insure that Northwestern does not continue to exclude him from playing on the Men's Division I Basketball Team. It is also clear that Knapp will suffer irreparable harm if injunctive relief is not granted since he will lose his chance of ever playing Division I basketball.

■ Next, I balance the harms. If Knapp is able to play basketball the harm to

Northwestern would be substantial, but quite contingent. It is the extremely slight risk that Knapp may harm another player if he receives a shock from his implantable defibrillator and the harm that Northwestern would suffer as an institution if a student wearing a Northwestern jersey were to collapse and die on the basketball court. The harm could include not only the general harm to its university reputation but also to its ability to recruit good student athletes. The harm to Knapp if he is unable to play is substantial and certain. Playing intercollegiate basketball is a major life activity for him and his inability to play would curtail his ability to live his life fully and end his chances, however speculative, of a professional basketball career. Knapp does not consider the risk of death to himself to constitute a harm as he is willing to assume that risk. I therefore find that the balance of harms weighs in favor of Nicholas Knapp.

Finally, I find there are arguments for the public interest of equal weight on both sides. Thus, the public interest does not preclude issuance of the injunction.

### Conclusion

The permanent injunction is granted. The motion for summary judgment is also denied.