Nicholas KNAPP, Plaintiff–Appellee,

v.

NORTHWESTERN UNIVERSITY, an Illinois not-for-profit corporation, and Rick Taylor, Defendants–Appellants.

No. 96–3450.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 7, 1996.

Decided Nov. 22, 1996.

Rehearing and Suggestion for Rehearing En Banc Denied Jan. 3, 1997.*

* The Honorable Joel M. Flaum, Circuit Judge, and the Honorable Ilana Diamond Rovner, Circuit Judge, did not participate in the consideration of this petition for rehearing.

Robert Andrew Chapman (argued), Chicago, IL, Stanley J. Horn, Horn & Villasuso, Chicago, IL, Eldon L. Ham, Steven T. Mandell, Zucker, Ham & Mandell, Northbrook, IL, Robert J. Shapiro, Jamaica Plain, MA, for Nicholas Knapp.

Amy D. Mayber, Northwestern University, Evanston, IL, Julian Solotorovsky (argued), Eric F. Quandt, Kelley, Drye & Warren, Chicago, IL, for Northwestern University and Richard Taylor.

Matthew J. Mitten, South Texas College of Law, Houston, TX, for amici American Medical Society for Sports Medicine and American Osteopathic Academy of Sports Medicine.

Before BAUER, DIANE P. WOOD and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

Nicholas Knapp wants to play NCAA basketball for Northwestern University—so badly that he is willing to face an increased risk of death to do so. Knapp is a competent, intelligent adult capable of assessing whether playing intercollegiate basketball is worth the risk to his heart and possible death, and to him the risk is acceptable. Usually, competent, intelligent adults are allowed to make such decisions. This is especially true when, as here, the individual's family approves of the decision and the individual and his parents are willing to sign liability waivers regarding the worst-case scenario should it occur.

Northwestern, however, refuses to allow Knapp to play on or even practice with its men's basketball team. Knapp, currently a sophomore at Northwestern, has the basketball skills to play at the intercollegiate level, but he has never taken the court for his team. Although Northwestern does not restrict him from playing pick-up basketball games, using recreational facilities on campus, or exerting himself physically on his own, the university disqualified Knapp from playing on its intercollegiate basketball team. The issue in this case boils down to whether the school—because of § 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794—will be forced to let Knapp don a purple uniform and take the floor as a member of Northwestern's basketball team.

Prior to his senior year of high school Knapp was rated among the best basketball players in Illinois. He was recruited by numerous universities, including Northwestern. At the end of Knapp's junior year at Peoria's Woodruff High School, Northwestern orally offered him an athletic scholarship to play basketball. Knapp orally accepted the offer.

A few weeks into his senior year, Knapp suffered sudden cardiac death—meaning his heart stopped—during a pick-up basketball game. Paramedics used cardiopulmonary resuscitation, defibrillation (i.e., electric shocks), and injections of drugs to bring Knapp back to life. A few weeks later, doctors implanted an internal cardioverter-defibrillator in Knapp's abdomen. The device detects heart arrhythmia and delivers a shock to convert the abnormal heart rhythm back to normal. In other words, if Knapp's heart stops again the device is supposed to restart it.

On the day following his sudden cardiac death, Northwestern informed Knapp and his family that whatever the ultimate medical decision, Northwestern would honor its commitment for a scholarship. Seven weeks after his collapse Knapp signed a national letter of intent to attend Northwestern.

Knapp did not play basketball during his senior year in high school, but he was always a superb student, and in June 1995 he graduated as the valedictorian of his class. In September 1995 he enrolled as a Northwestern student.

On November 7, 1995, Dr. Howard Sweeney, Northwestern's head team physician, declared Knapp ineligible to participate on

Northwestern's men's basketball team for the 1995–96 school year.[1] Dr. Sweeney based his decision on Knapp's medical records in which several treating physicians recommended that Knapp not play competitive basketball, the report of team physician Dr. Mark Gardner following a physical examination of Knapp, published guidelines and recommendations following two national medical conferences known as the Bethesda Conferences[2] regarding eligibility of athletes with cardiovascular abnormalities, and recommendations of physicians with whom Dr. Gardner and Dr. Sweeney consulted. After the basketball season ended, Northwestern and the Big Ten declared Knapp permanently medically ineligible to play basketball. Northwestern's athletic director, Rick Taylor, later confirmed that Northwestern will never voluntarily let Knapp play intercollegiate basketball as a Wildcat.

As a result, Knapp has never practiced with the Northwestern team nor played in a college game. His scholarship nevertheless continues and he attends practices (though he is not allowed to do anything but watch, apparently). He also receives other benefits afforded to athletes (such as tutoring, counseling, and training table), in addition to the full range of academic and nonacademic offerings the university provides to all students.

On the same day Dr. Sweeney declared him ineligible, Knapp filed a complaint in federal district court asserting that North-western's actions violated the Rehabilitation Act. The suit sought declaratory relief, preliminary and permanent injunctive relief, and compensatory damages. Knapp's undisputed goal is to force Northwestern to allow him to play varsity basketball.

In May 1996 Northwestern filed a motion for summary judgment, and Knapp thereafter requested a permanent injunction. The district court held a hearing on September 6, 1996, solely to determine whether Knapp presently is medically eligible to play intercollegiate basketball. Presented with conflicting evidence, the district court found Knapp medically eligible and Northwestern in violation of the Rehabilitation Act. After subsequent hearings on the issue of reasonable accommodation, the district court denied Northwestern's motion for summary judgment and entered a permanent injunction prohibiting Northwestern from excluding Knapp from playing on its basketball team for any reason related to his cardiac condition.

. The district court's decision was based on the affidavit of Knapp and the testimony and affidavits of two experts presented by Northwestern and three experts presented by Knapp. All the experts agreed Knapp had suffered sudden cardiac death due to ventricular fibrillation; even with the internal defibrillator, playing intercollegiate basketball places Knapp at a higher risk for suffering another event of sudden cardiac death com-

1. Northwestern's Presidential Directive on Self-Regulation of Intercollegiate Athletics, the Big Ten Conference's Handbook Agreements for Men's Programs, and the NCAA's Constitution and Sports Medicine Handbook all give the team physician sole responsibility to decide whether a student is medically eligible to compete on the basketball team.

2. Two national medical conferences were held in Bethesda, Maryland, for the specific purpose of establishing prudent consensus recommendations among cardiologists and sports medicine physicians regarding the eligibility of athletes with cardiovascular abnormalities to compete in sports. The first, known as the 16th Bethesda Conference, was held in 1984 and titled "Cardiovascular Abnormalities in the Athlete: Recommendations Regarding Eligibility for Competition." The consensus recommendations from that conference were published in the *Journal of* the American College of Cardiology in December 1985. The second, known as the 26th Bethesda Conference and titled "Recommendations for Determining Eligibility for Competition in Athletes with Cardiovascular Abnormalities," was held in January 1994. The consensus recommendations of that conference were published in the *Journal of the American College of Cardiology* in October 1994.

The 26th Bethesda Conference's task force on arrhythmias addressed conditions like Knapp's and implanted cardioverter-defibrillators. This task force recommended that athletes with ventricular fibrillation "that result in cardiac arrest in the presence or absence of structural heart disease cannot participate in any moderate or high intensity competitive sports." 24 *Journal of the American College of Cardiology* 845, 897 (1994). "For athletes with implantable defibrillators ... all moderate and high intensity sports are contraindicated." *Id.*

pared to other male college basketball players; the internal defibrillator has never been tested under the conditions of intercollegiate basketball; and no person currently plays or has ever played college or professional basketball after suffering sudden cardiac death and having a defibrillator implanted. Northwestern's experts, cardiologists who participated in at least one of the Bethesda conferences, testified that playing intercollegiate basketball significantly and unacceptably increases Knapp's risk of death. At least one of Northwestern's experts stated that individuals with internal defibrillators should not play intercollegiate basketball. Knapp's expert cardiologists, one of whom, Dr. Lawrence Rink, is Knapp's treating cardiologist and an Indiana University basketball team physician, testified that although Knapp is at an increased risk for sudden cardiac death, that risk, especially with the internal defibrillator in place, is insubstantial or at least acceptable.

After tasting defeat in the district court, Northwestern filed an emergency notice of appeal on September 27, 1996. It also sought a stay of enforcement of the injunction. We expedited the proceedings, granted the stay pending this decision, and heard oral arguments on November 7, 1996, ironically one year to the day after Dr. Sweeney first declared that Knapp could not play basketball for Northwestern.

■ We review the district court's grant of a permanent injunction for abuse of discretion. *United States v. Kaun*, 827 F.2d 1144, 1148 (7th Cir.1987). Factual determinations are reviewed under a clearly erroneous standard and legal conclusions are given *de novo* review. A factual or legal error may be sufficient to establish an abuse of discretion. *Id.* Interpretation of the Rehabilitation Act presents legal questions calling for *de novo* review.

■ The Rehabilitation Act, which is the sole basis for Knapp's claim, ensures that

[n]o otherwise qualified individual with a disability in the United States, as defined in section 7(8) [29 USCS § 706(8) ], shall,

solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance....

29 U.S.C. § 794(a). To prevail on his claim for discrimination under the Act, Knapp must prove that: (1) he is disabled as defined by the Act; (2) he is otherwise qualified for the position sought; (3) he has been excluded from the position solely because of his disability; and (4) the position exists as part of a program or activity receiving federal financial assistance. *Byrne v. Board of Educ., School of West Allis–West Milwaukee*, 979 F.2d 560, 563 (7th Cir.1992). Northwestern does not dispute that it receives federal financial assistance and that it has excluded Knapp from its intercollegiate basketball program solely because of his cardiac condition, so our focus is on whether Knapp is an "otherwise qualified individual with a disability."

■ To show that he is disabled under the terms of the Act, Knapp must prove that he

(i) has a physical ... impairment which substantially limits one or more of [his] major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment.

29 U.S.C. § 706(8)(B). Knapp satisfies the first element of part (i) of this definition. A cardiovascular problem constitutes a physical impairment under § 706(8)(B). 34 C.F.R. § 104.3(j)(2)(i)(A); 45 C.F.R. § 84.3(j)(2)(i)(A). Northwestern does not dispute this fact, but it instead zeros in on the second element of the disability definition: whether playing intercollegiate basketball is part of a major life activity and, if so, whether its diagnosis of Knapp's cardiac condition substantially limits Knapp in that activity.

In determining whether a particular individual has a disability as defined in the Rehabilitation Act, the regulations promulgated by the Department of Health and Human Services [3] with the oversight and approval of

---

**3.** For the most part, the regulations implementing the Rehabilitation Act promulgated by the

Department of Health and Human Services are . identical to those promulgated by the Depart-

Congress are of significant assistance. *School Bd. of Nassau County, Fla. v. Arline,* 480 U.S. 273, 279, 107 S.Ct. 1123, 1126, 94 L.Ed.2d 307 (1987); *Byrne,* 979 F.2d at 563. Those regulations define "major life activities" as basic functions of life "such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 34 C.F.R. § 104.3(j)(2)(ii); 45 C.F.R. § 84.3(j)(2)(ii). Regulations regarding equal employment opportunities under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.,* adopt the same term and definition and an interpretive note provides a bit more guidance: " 'Major life activities' are those basic activities that the average person in the general population can perform with little or no difficulty." 29 C.F.R. pt. 1630, app. § 1630.2.

 The regulations promulgated pursuant to the Rehabilitation Act do not define "substantial limitation," and this is not an oversight. In commentary following the regulations, both the Department of Education and the Department of Health and Human Services acknowledge "the lack of any definition in the proposed regulation of the phrase 'substantially limits.' The Department does not believe that a definition of this term is possible at this time." 34 C.F.R. pt. 104, app. A, subpt. A(3); 45 C.F.R. pt. 84, app. A, subpt. A(3). "The court must ask 'whether the particular impairment constitutes for the particular person a significant barrier to [a major life activity].' " *Byrne,* 979 F.2d at 565 (quoting *Forrisi v. Bowen,* 794 F.2d 931, 933 (4th Cir.1986)).

This case is difficult because it does not fit neatly under the Rehabilitation Act. The "disability" Knapp claims is the basis for discrimination against him is not a continuing one like blindness or deafness. At any given moment in time when Knapp's heart is functioning properly his disability does not affect him. He is truly disabled only when his heart stops, which may or may not happen to him again. The disability regarding which Northwestern allegedly discriminates, therefore, actually is the greater risk of harm for Knapp than the risk faced by other male college basketball players. In addition, other

impairments usually do not have as severe a result as is possible in this case. A person who is deaf, for instance, will not suddenly die on the basketball court because of that disability. Here, Knapp's disability is all or nothing. Finally, because Knapp's disability affects one of the most central organs of the body, his disability to some extent affects *all* major life activities—if his heart stops, he will not breathe, see, speak, walk, learn, or work. Once again it is all or nothing—either his heart is functioning and no major life activities are limited at that moment, or it has stopped and the most major life activity of all—living—has been affected.

In any event, the parties here have framed their arguments as involving solely the major life activity of learning. Knapp contends that playing an intercollegiate sport is an integral part of his major life activity of learning and that his education will be substantially limited if he cannot play on the team. He states that he does not believe he can obtain confidence, dedication, leadership, perseverance, discipline, and teamwork in any better way. The district court agreed with him, determining that *for Knapp,* playing on the Northwestern basketball team was part of the major life activity of learning and that he was substantially limited from such learning by the university.

 In their arguments, the parties have separated "substantially limited" and "major life activities" into two independent criteria. We do not believe that such a complete separation should be made, at least in regard to learning and working. A comment on this point by the Sixth Circuit is insightful:

> The court in [citation omitted] treated "substantially limiting" and "major life activity" as distinct statutory qualifications. [Citation omitted.] However, at least with respect to the major life activity of "working", they constitute an inseparable whole. An impairment that affects only a narrow range of jobs can be regarded either as not reaching a major life activity or as not substantially limiting one.

*Jasany v. United States Postal Service,* 755 F.2d 1244, 1249 n. 3 (6th Cir.1985). We

ment of Education. *Compare* 45 C.F.R. pt. 84 *with* 34 C.F.R. pt. 104. We cite to both.

think this same interrelationship applies regarding learning. If playing NCAA basketball reaches a major life activity, then it is likely that deprivation of that activity would, for the individual basketball player, be a substantial limitation. Likewise, if playing intercollegiate basketball does not reach the status of major life activity, then it is most likely that deprivation will not be a substantial limitation.

■ We do not think that the definition of "major life activity" can be as particularized as Knapp wants it to be. Playing intercollegiate basketball obviously is not in and of itself a major life activity, as it is not a basic function of life on the same level as walking, breathing, and speaking. Not everyone gets to go to college, let alone play intercollegiate sports. We acknowledge that intercollegiate sports can be an important part of the college learning experience for both athletes and many cheering students—especially at a Big Ten school. Knapp has indicated that such is the case for him. But not every student thinks so. Numerous college students graduate each year having neither participated in nor attended an intercollegiate sporting event. Their sheepskins are no less valuable because of the lack of intercollegiate sports in their lives. Not playing intercollegiate sports does not mean they have not learned. Playing or enjoying intercollegiate sports therefore cannot be held out as a *necessary* part of learning for *all* students.

A few cases, none of them binding on us, have considered school team sports a major life activity in and of themselves. *See Pahu-*

*lu v. University of Kansas,* 897 F.Supp. 1387 (D.Kan.1995) (intercollegiate football may be a major life activity); *see also Sandison v. Michigan High School Athletic Ass'n, Inc.,* 863 F.Supp. 483, 489 (E.D.Mich.1994) (participation on the cross-country and track teams an important and integral part of education and a major life activity), *rev'd on other grounds,* 64 F.3d 1026 (6th Cir.1995). In other cases involving school athletics, whether they constituted part of the major life activity of learning is not even discussed. *See Grube v. Bethlehem Area Sch. Dist.,* 550 F.Supp. 418 (E.D.Pa.1982) (disability assumed, so major life activity not discussed); *see also Wright v. Columbia Univ.,* 520 F.Supp. 789 (E.D.Pa.1981) (parties did not dispute that player was disabled).

Because intercollegiate athletics may be *one part* of the major life activity of learning for *certain* students, the parties here have framed the analysis of what constitutes a major life activity into a choice between a subjective test or an objective test—whether we look at what constitutes learning for Nick Knapp or what constitutes learning in general for the average person. The Rehabilitation Act and the regulations promulgated under it give little guidance regarding whether the determination of what constitutes a major life activity turns on an objective or subjective standard.[4] And while we have previously said that whether a person is disabled is "an individualized inquiry, best suited to a case-by-case determination," we have also indicated that "the definition of 'major life activity' in the regulations 'cannot be interpreted to include working at the specific

---

4. Knapp argues that because the regulations contain prohibitions against discrimination in postsecondary athletics, including intercollegiate teams, it follows that such athletics constitute a major life activity. That is not the case. Such regulations have no effect on the phrase "otherwise qualified with a disability," but rather on the portion of 29 U.S.C. § 794(a) discussing a "program or activity." For instance, 34 C.F.R. § 104.43(a) and 45 C.F.R. § 84.43(a) provide that
[n]o qualified handicapped student shall, on the basis of handicap, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any ... athletics, ... other extracurricular, or other postsecondary education program or activity to which this subpart applies[;]

and 34 C.F.R. § 104.47(a) and 45 C.F.R. § 84.47(a) state that
[i]n providing physical education courses and athletics and similar programs and activities to any of its students, a recipient to which this subpart applies may not discriminate on the basis of handicap. A recipient that offers physical education courses or that operates or sponsors *intercollegiate, club, or intramural athletics* shall provide to qualified handicapped students an equal opportunity for participation in these activities.
These regulations apply only after it is determined that the individual is disabled and qualified.

job of one's choice,'" *Byrne*, 979 F.2d at 565. Other courts have been across the board on whether the test is objective or subjective. *Compare Pahulu*, 897 F.Supp. at 1393 ("for Pahulu, intercollegiate football may be a major life activity, i.e., learning"), *and Sandison*, 863 F.Supp. at 489 (participation on high school teams is "as to them a major life activity"), *with Welsh v. City of Tulsa, Okla.*, 977 F.2d 1415, 1417 (10th Cir.1992) (major life activity of working does not necessarily mean working at the job of one's choice).

We decline to define the major life activity of learning in such a way that the Act applies whenever someone wants to play intercollegiate athletics. A "major life activity," as defined in the regulations, is a basic function of life "such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 34 C.F.R. § 104.3(j)(2)(ii); 45 C.F.R. § 84.3(j)(2)(ii). These are basic functions, not more specific ones such as being an astronaut, working as a firefighter, driving a race car, or learning by playing Big Ten basketball.

■ However, major life activities are defined in a more individualized manner during the "substantial limitation" analysis, where, according to *Byrne*, 979 F.2d at 565, we look at whether the particular impairment constitutes a significant barrier for the particular person. What impairment will significantly impede learning for a person obtaining her third doctorate is not the same as one which would affect the average tenth grader's ability to learn. But any narrowing of what constitutes learning for a particular individual occurs within reasonable limits—coverage of the Rehabilitation Act is not open-ended or based on every dream or desire that a person may have. Not every impairment that affects an individual's major life activities is a substantially limiting impairment. The key obviously is the extent to which the impairment restricts the major life activity.

*Roth v. Lutheran General Hospital*, 57 F.3d 1446, 1454 (7th Cir.1995). For that individual, "[t]he impairment must limit [learning] generally." *Byrne*, 979 F.2d at 565. Just as "[i]t is well established that an inability to perform a particular job for a particular employer is not sufficient to establish a handicap [in regard to working]," the inability to engage in a particular activity for a particular university is not sufficient to establish a disability in regard to education. *Id.; see Heilweil v. Mt. Sinai Hosp.*, 32 F.3d 718 (2d Cir.1994) (no disability because asthmatic condition did not substantially limit breathing or working except while in one room of building), *cert. denied*, —— U.S. ——, 115 S.Ct. 1095, 130 L.Ed.2d 1063 (1995); *Welsh*, 977 F.2d at 1419 (sincere desire to become a firefighter does not mean inability to become one due to sensory deprivation in fingers substantially limits ability to work); *Daley v. Koch*, 892 F.2d 212, 215 (2d Cir.1989) (being declared unsuitable for particular position of police officer not substantial limitation of major life activity). An impairment that interferes with an individual's ability to perform a particular function, but does not significantly decrease that individual's ability to obtain a satisfactory education otherwise, does not *substantially* limit the major life activity of learning. *Welsh*, 977 F.2d at 1418.

Because learning through playing intercollegiate basketball is only one part of the education available to Knapp at Northwestern, even under a subjective standard, Knapp's ability to learn is not substantially limited. Knapp's scholarship continues, allowing him access to all academic and—except for intercollegiate basketball—all nonacademic services and activities available to other Northwestern students, in addition to all other services available to scholarship athletes. Although perhaps not as great a learning experience as actually playing, it is even possible that Knapp may "learn" through the basketball team in a role other than as a player.[5] Knapp is an intelligent

---

5. Although the present situation appears not to be an ideal learning setting, it is *possible* that in the future Knapp may be allowed more of a role where he will gain knowledge and experience through his participation with the team other than as a player. In the face of Knapp's affidavit, though, we find somewhat disingenuous Northwestern's assertion that Knapp currently is given an opportunity to participate in the basketball program. Knapp indicates that he must attend each practice and game, but he just sits on the bench doing nothing. At practices he is not

student and athlete, and the inability to play intercollegiate basketball at Northwestern [6] forecloses only a small portion of his collegiate opportunities. Like the firefighter in *Welsh*, who did not show that his education and training limited him to being a firefighter, *Welsh*, 977 F.2d at 1419, Knapp has not shown that his education and training limit him to do nothing but play basketball. The fact that Knapp's goal of playing intercollegiate basketball is frustrated does not substantially limit his education. The Rehabilitation Act does not guarantee an individual the exact educational experience that he may desire, just a fair one. Consequently, we hold that Knapp as a matter of law is not disabled within the meaning of the Rehabilitation Act.

▪ Even if we were inclined to find Knapp disabled under the Rehabilitation Act, he would still come up short because we also hold as a matter of law that he is not, under the statute, "otherwise qualified" to play intercollegiate basketball at Northwestern. A qualified disabled person, with respect to postsecondary education services, is a "person who meets the academic and technical standards requisite to admission or participation in the [school's] education program or activity." 34 C.F.R. § 104.3(k)(3); 45 C.F.R. § 84.3(k)(3). An explanatory note to the regulations states that the term "technical standards" means "all nonacademic admissions criteria that are essential to participation in the program in question." 34 C.F.R. pt. 104, app. A, subpt. A(5); 45 C.F.R. pt. 84, app. A, subpt. A(5).

▪ Section 794 does not compel educational institutions to disregard the disabilities of disabled persons. *Southeastern Community College v. Davis*, 442 U.S. 397, 405, 99 S.Ct. 2361, 2366, 60 L.Ed.2d 980 (1979). It requires only that an "otherwise qualified" disabled person not be excluded from participation in a federally funded program solely because of the disability. *Id.* In other words, although a disability is not a permissible ground for assuming an inability to function in a particular context, the disability is not thrown out when considering if the person is qualified for the position sought. *Id.* at 405–06, 99 S.Ct. at 2366–67. "An otherwise qualified person is one who is able to meet all of a program's requirements in spite of his handicap," *id.* at 406, 99 S.Ct. at 2367, with reasonable accommodation, *see Arline*, 480 U.S. at 287–88 n. 17, 107 S.Ct. at 1131 n. 17 ("when a handicapped person is not able to perform the essential functions of the job, the court must also consider whether any reasonable accommodation by the employer would enable the handicapped person to perform those functions").

▪ Legitimate physical qualifications may in fact be essential to participation in particular programs. *Southeastern*, 442 U.S. at 407, 99 S.Ct. at 2367.

Paragraph (k) of § 84.3 defines the term "qualified handicapped [7] person." Throughout the regulation, this term is used instead of the statutory term "otherwise qualified handicapped person." The Department believes that the omission of the word "otherwise" is necessary in order to comport with the intent of the statute because, read literally, "otherwise" qualified handicapped persons include persons who are qualified except for their handi-

allowed to do anything but watch. If these facts are true, and Northwestern has not argued that they are not, Knapp is not currently being afforded much of an opportunity for true participation—even nonplaying "participation"—on the team.

6. Some may wonder why Knapp, if he wants to play basketball so badly, does not just transfer to another school where he is guaranteed the opportunity to play for a team. That thought assumes all colleges and universities are interchangeable, which we decline to believe is true. Outside of basketball, Knapp may very well feel that Northwestern provides for him the best set-

ting academically, socially, geographically, and otherwise. Nevertheless, Knapp has offered no evidence that there are no other schools to which he could transfer where he would be allowed to play. Northwestern is not the only place where Knapp may obtain an education, which confirms that denial of the right to play basketball *at Northwestern* is not a denial of his general ability to learn at the college level.

7. The Rehabilitation Act was amended in 1992 to replace the term "handicap" with the word "disability." Rehabilitation Act Amendments of 1992, Pub.L. No. 102–569, 106 Stat. 4360. The regulations have not caught up.

cap, rather than in spite of their handicap. Under such a literal reading, a blind person possessing all the qualifications for driving a bus except sight could be said to be "otherwise qualified" for the job of driving. Clearly, such a result was not intended by Congress. In all other respects, the terms "qualified" and "otherwise qualified" are intended to be interchangeable.

45 C.F.R. pt. 84, app. A, subpt. A(5); 34 C.F.R. pt. 104, app. A, subpt. A(5). Although blanket exclusions are generally unacceptable, legitimate physical requirements are proper. *See Southeastern,* 442 U.S. at 407, 99 S.Ct. at 2367; *Davis v. Meese,* 692 F.Supp. 505, 517 (E.D.Pa.1988), *aff'd,* 865 F.2d 592 (3d Cir.1989).

■ A significant risk of personal physical injury can disqualify a person from a position if the risk cannot be eliminated. *Chiari v. City of League City,* 920 F.2d 311, 317 (5th Cir.1991). But more than merely an elevated risk of injury is required before disqualification is appropriate. *Mantolete v. Bolger,* 767 F.2d 1416, 1424 (9th Cir.1985). Any physical qualification based on risk of future injury must be examined with special care if the Rehabilitation Act is not to be circumvented, since almost all disabled individuals are at a greater risk of injury. *Bentivegna v. United States Dept. of Labor,* 694 F.2d 619, 622 (9th Cir.1982).

■ In *Mantolete,* the Ninth Circuit addressed the standard to apply in determining if an individual is otherwise physically qualified to perform an activity when the possibility of future injury exists:

[I]n some cases, a job requirement that screens out qualified handicapped individuals on the basis of possible future injury is necessary. However, we hold that in order to exclude such individuals, there must be a showing of a reasonable probability of substantial harm. Such a determination cannot be based merely on an employer's subjective evaluation or, except in cases of a most apparent nature, merely on medical reports. The question is whether, in light of the individual's work history and medical history, employment of that individual would pose a reasonable probability of substantial harm.

. . . .

In applying this standard, an employer must gather all relevant information regarding the applicant's work history and medical history, and independently assess both the probability and severity of potential injury. This involves, of course, a case-by-case analysis of the applicant and the particular job.

767 F.2d at 1422; *see Chiari,* 920 F.2d at 317 (disabled person not qualified for job if there is genuine substantial risk that worker could be injured or could injure others and employer cannot modify job to eliminate risk). We agree this is the appropriate standard. We now turn, however, to who should make such an assessment.

In this case, the severity of the potential injury is as high as it could be—death. In regard to the probability of injury, Dr. John H. McAnulty, one of Knapp's experts, testified at the injunction hearing that the annual risk of death to Knapp as a result of his cardiac condition under a worst-case scenario is 2.4 percent and that playing intercollegiate basketball would elevate this annual risk to 2.93 percent, or 1 in 34. In other words, if 34 Nick Knapps played basketball for a year, chances are one would die. Dr. Brian Olshansky, another expert for Knapp, put Knapp's risk of death for the 1996–97 basketball season at no greater than 1 in 100. These estimates took into account Knapp's internal defibrillator, apparently the only "accommodation" possible for Knapp's condition. Although the doctors indicated that these numbers were merely estimates, all agreed that the risk to Knapp is higher than to the average male collegiate basketball player. Knapp's experts believed it was an acceptable level of risk.

Northwestern's experts agreed with the school's team doctors that Knapp's participation in competitive Big Ten basketball presented an unacceptable level of risk. According to Dr. Barry J. Maron, one of Northwestern's experts, based on a 10–year study, the risk of nontraumatic death for the average male college basketball player is 1 in 28,818. Dr. Maron further testified that participation in intercollegiate basketball signifi-

cantly increases Knapp's risk of death, although he believed the precise risk could not be quantified. Dr. Douglas J. Zipes agreed. According to both Drs. Zipes and Maron, the most important fact in assessing Knapp's current risk of sudden cardiac death while playing intercollegiate basketball is the fact that his previous sudden cardiac death was induced by playing basketball.

Knapp's and Northwestern's experts disagreed on the effect of the passage of time on the likelihood that Knapp would suffer another sudden cardiac death. Almost all experts agreed that the internal defibrillator had never been tested under conditions like an intercollegiate basketball game or practice and that it was unclear whether the device would actually work under the stress and physical conditions of a high-intensity sport. Dr. Olshansky, though, indicated that bi-weekly "interrogations" of the defibrillator would minimize the risk of its failure. Knapp has had his defibrillator checked on a regular basis and has had no problems with it.

■ The district court judge in this case believed that in the face of conflicting opinion evidence regarding risk, and the fact that no scientific data existed to quantify that risk, the decision on whether Knapp should play falls in the lap of the court:

We have nothing more exotic here than highly qualified experts, in agreement on all the basic scientific principles and differing only in their medical judgment on the final question.... All possess the education, training and experience required to become experts and none disputes the expertise of the others. The range of disagreement is extremely narrow, confined only to the dimensions of the risk of recurrence and the effect of the passage of time on that risk.... [M]y task is to consider all the opinions and determine which are most persuasive. It is what the trial of disputes such as this will sometimes require. It might have been better to have left the choice to a panel of physicians, but Congress left it with the courts and the random assignment of this case has left it here with me.

... I again find the opinions of Drs. McAnulty, Rink and Olshansky to be persuasive and I find that the risk to Nicholas Knapp of a repeat episode is not substantial.

We disagree with the district court's legal determination that such decisions are to be made by the courts and believe instead that medical determinations of this sort are best left to team doctors and universities as long as they are made with reason and rationality and with full regard to possible and reasonable accommodations. In cases such as ours, where Northwestern has examined both Knapp and his medical records, has considered his medical history and the relation between his prior sudden cardiac death and the possibility of future occurrences, has considered the severity of the potential injury, and has rationally and reasonably reviewed consensus medical opinions or recommendations in the pertinent field—regardless whether conflicting medical opinions exist—the university has the right to determine that an individual is not otherwise medically qualified to play without violating the Rehabilitation Act. The place of the court in such cases is to make sure that the decision-maker has reasonably considered and relied upon sufficient evidence specific to the individual and the potential injury, not to determine on its own which evidence it believes is more persuasive.

Other courts have held the same. In *Pahulu*, for instance, an intercollegiate football player presented testimony of three specialists in an attempt to show that his risk of permanent neurological injury was no greater than any other player's and that the University of Kansas declared him physically ineligible based on misconceptions. The Kansas district court nevertheless found that "the conclusion of the KU physicians, although conservative, is reasonable and rational ... and is supported by substantial competent evidence for which the court is unwilling to substitute its judgment." *Pahulu*, 897 F.Supp. at 1394. We reject those cases intimating that a school's rational decision has no weight. *See Poole v. South Plainfield Bd. of Educ.*, 490 F.Supp. 948, 954 (D.N.J.1980) (school board incorrectly "insist-

ed nonetheless in imposing its own rational decision over the rational decision of the Pooles").

In *Arline,* where a school teacher with tuberculosis was fired and thereafter sued her employer under the Rehabilitation Act, the Supreme Court stated that an "otherwise qualified" inquiry must be individualized and should include

"... facts, based on reasonable medical judgments given the state of medical knowledge, about(a) the nature of the risk ..., (b) the duration of the risk ..., [and] (c) the severity of the risk...."

In making these findings, the courts normally should defer to the reasonable medical judgments of public health officials.

*Arline,* 480 U.S. at 287–88, 107 S.Ct. at 1130–31. The Court, however, refrained from addressing the deferential weight of the medical judgments of private physicians on which the employer relied. *Id.* Although the Bethesda Conferences were not convened by public health officials and such guidelines should not substitute for individualized assessment of an athlete's particular physical condition, the consensus recommendations of several physicians in a certain field do carry weight and support the Northwestern team doctors' individualized assessment of Knapp.

We do not believe that, in cases where medical experts disagree in their assessment of the extent of a real risk of serious harm or death, Congress intended that the courts—neutral arbiters but generally less skilled in medicine than the experts involved—should make the final medical decision. Instead, in the midst of conflicting expert testimony regarding the degree of serious risk of harm or death, the court's place is to ensure that the exclusion or disqualification of an individual was individualized, reasonably made, and based upon competent medical evidence. So long as these factors exist, it will be the rare case regarding participation in athletics where a court may substitute its judgment for that of the school's team physicians.

In this case, the district court found that if as a matter of law and fact, all that is required, as *Pahulu* [cite omitted] holds, is that Northwestern make a rational deci-

sion that Knapp's risk is substantial based on reasonable evidence to which courts must defer, then I find Northwestern has done this.

Because we hold today as a matter of law that a court must allow Northwestern to make its own determinations of substantial risk and severity of injury if they are based on reliable evidence, the district court's order forcing Northwestern to let Knapp play must be reversed.

We note further that the district court did not distinguish between the reasonableness of Northwestern's decision to exclude Knapp back in the 1995–96 season and the reasonableness of its decision to bar him from playing this year and the next two. Knapp contends that no proper finding of reasonableness appears in the record because the district court stated that the issue to be addressed was Knapp's condition this fall rather than the rectitude or irrectitude of Northwestern's actions. Dr. Sweeney's and Dr. Gardner's bases for deeming Knapp ineligible in 1995–96 do appear in the record, however, and both testified regarding the present season that, based upon their prior information and the newer testimony of Drs. Rink, Olshansky, McAnulty, Maron, and Zipes, they still believed Knapp remains at a substantial risk of death by playing intercollegiate basketball.

In closing, we wish to make clear that we are *not* saying Northwestern's decision necessarily is the right decision. We say only that it is not an illegal one under the Rehabilitation Act. On the same facts, another team physician at another university, reviewing the same medical history, physical evaluation, and medical recommendations, might reasonably decide that Knapp met the physical qualifications for playing on an intercollegiate basketball team. Simply put, all universities need not evaluate risk the same way. What we say in this case is that if substantial evidence supports the decision-maker—here Northwestern—that decision must be respected.

██ Section 794 prohibits authorities from deciding without significant medical support that certain activities are too risky for a disabled person. Decisions of this sort

cannot rest on paternalistic concerns. Knapp, who is an adult, is not in need of paternalistic decisions regarding his health, and his parents—more entitled to be paternalistic toward him than Northwestern—approve of his decision. *See Wright* at 794 (Columbia's decision not to allow student with sight in only one eye to play football "contrary to the express wishes of his parents who, together with their son, have reached a rational decision concerning the risk involved"). In regard to cases involving risk of future injury, a school's perception of the threat of such injury cannot be based on unfounded fears or stereotypes; it must be based on objective evidence. *Chiari,* 920 F.2d at 317. But here, where Northwestern acted rationally and reasonably rather than paternalistically, no Rehabilitation Act violation has occurred. The Rehabilitation Act "is carefully structured to replace ... reflexive actions to actual or perceived handicaps with actions based on reasoned and medically sound judgments...." *Arline,* 480 U.S. at 284–85, 107 S.Ct. at 1129.

For these reasons, the district court's grant of the permanent injunction and denial of Northwestern's motion for summary judgment are reversed and the case is remanded with instructions to enter summary judgment in favor of Northwestern.

REVERSED.