# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 02-4119

CHRIST UNIVERSAL MISSION CHURCH,

*Plaintiff-Appellee*,

v.

CITY OF CHICAGO,

*Defendant-Appellant.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 01 C 1429—**Wayne R. Andersen**, *Judge.*

———————

ARGUED OCTOBER 23, 2003—DECIDED MARCH 26, 2004

———————

Before MANION, KANNE, and EVANS, *Circuit Judges.*

KANNE, *Circuit Judge.*

## I.  Background

The City of Chicago, through its city council, promulgates zoning ordinances governing where various entities may locate within the City. The portion of the Chicago Zoning Ordinance ("CZO") at issue in this case, 17 Municipal Code of Chicago Article 10.3-1 (2000), has already been the subject of litigation in *Civil Liberties for Urban Believers v.*

*City of Chicago*, 342 F.3d 752 (7th Cir. 2003), *reh'g en banc denied*, 2003 U.S. App. LEXIS 24176 (Nov. 26, 2003). In that case, Civil Liberties for Urban Believers ("CLUB") and five individual member churches argued that the CZO's treatment of places of worship as compared to similar assembly uses was unconstitutional and violated the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. §§ 2000cc *et seq.* Notably, the City amended the CZO in February 2000 in response to CLUB's lawsuit. In doing so, it attempted to equalize the treatment of churches and other like organizations within its zoning scheme. For example, the City amended the CZO to require clubs, lodges, meeting halls, recreation buildings, and community centers to obtain special use approval to locate within any B (business) or C (commercial) districts. This placed those assembly uses on the same footing as churches, which prior to and following the amendments also had to obtain special use permits to locate in any B or C district. *CLUB*, 342 F.3d at 758 (describing the City's 2000 CZO amendments).

Even after the amendments, CLUB continued to press that the CZO failed to comply with RLUIPA by substantially burdening religious exercise and discriminating against churches. It also claimed that the CZO violated the First and Fourteenth Amendments to the United States Constitution by prohibiting the free exercise of religion and denying churches equal protection under the law, among other challenges. In *CLUB*, we upheld the CZO under RLUIPA, finding that the February 2000 amendments did not substantially burden religious exercise and "simply place churches on an equal footing with nonreligious assembly uses, thereby correcting any potential violation of [RLUIPA's] nondiscrimination provision." *Id.* at 762.

We also held that the CZO, as amended in February 2000, was constitutional. We discerned no violation of the Free Exercise Clause, and we determined that the zoning scheme

satisfied the requirements of the Equal Protection Clause. As to the equal protection challenge, we found that any remaining differences in treatment between religious and nonreligious assembly uses after the February 2000 amendments were "rationally related to Chicago's legitimate interest in regulating land use within its city limits." *Id.* at 767.

The *CLUB* court examined the CZO amendments in their entirety, as introduced through MA (mayoral application) 59 at the January 25, 2000 session of the city council's zoning committee. MA-59 was passed by the city council on February 16, 2000. It went into effect March 14, 2000, after the Mayor had an opportunity to review the ordinance as passed and after publication in the city council's Journal of Proceedings.

MA-59 contained nine sections amending language in several different CZO articles. The present matter deals only with the amendment to CZO Article 10.3-1, contained in § 7 of MA-59. It is before us because of an unfortunate wrinkle in the Chicago city council's efforts to enact MA-59. Specifically, the version of the amended CZO released to the public contained a misprint. Instead of correctly representing that Article 10.3-1, as amended, removed recreation buildings and community centers as permitted uses in M (manufacturing) districts (the "community- center deletion"), it continued to list them as allowed. The city council corrected the misprint, but not until two years later, in February 2002.

Although the parties in the *CLUB* case noted the misprint in footnotes in their appellate briefs, it was not an issue before the *CLUB* court. Thus, our decision in that case, although finding the CZO constitutional and in compliance with RLUIPA as of the February 2000 amendments, did not address the effect, if any, of the misprint on the enactment of the community-center deletion. We must do so here, as explained below.

## II. Facts

Christ Universal Mission Church purchased property in an M district in June 2000. Churches, unlike recreation buildings and community centers, have never been permitted uses in M districts, either before or after the February 2000 CZO amendments. Christ Universal challenged the CZO as unconstitutional and illegal under RLUIPA when it discovered that it could not operate in its chosen location without seeking a map amendment but that community centers could (according to the *published* version of the CZO).[1] Christ Universal sought a preliminary injunction to prevent the City from enforcing the CZO's prohibition on churches in M districts in this instance, which would allow Christ Universal to function as a church on its M-district property.

The district judge determined that the city council did not effectively amend Article 10.3-1 of the CZO barring recreation buildings and community centers from M districts until February 2002 when it issued a correction to its Journal of Proceedings. The district court then went on to grant Christ Universal's request for a preliminary injunction. It found no rational basis for the City to permit community centers in M districts yet exclude churches, resulting in a violation of the Equal Protection Clause of the Fourteenth Amendment and RLUIPA. It did note, however, that the February 2002 correction effectively amended the CZO to ban both churches and community centers from M districts and brought the CZO into compliance with the Equal Protection Clause. But, because the CZO was unconstitutional at the time Christ Universal purchased and starting using its M-district property as a church, the

---

[1] Christ Universal's arguments in many ways mirror those made by the appellants in *CLUB*, *supra*, which is not surprising, as they are represented by the same counsel.

district court held that it could continue operating there as a nonconforming legal use. The district court subsequently made the preliminary injunction permanent, based on the record compiled in the preliminary injunction hearing and briefing. This appeal followed.

### III.  Analysis

We review a district court's decision to grant a permanent injunction for abuse of discretion. *3M v. Pribyl*, 259 F.3d 587, 597 (7th Cir. 2001) (*citing Knapp v. Northwestern Univ.*, 101 F.3d 473, 478 (7th Cir. 1996)). Findings of fact are reviewed for clear error and legal conclusions de novo. *Id.* "A factual or legal error may be sufficient to establish abuse of discretion." *Id.* We begin our inquiry with the district court's legal determination that Article 10.3-1 of the CZO was not effectively amended until February 2002.

According to Illinois statute:

> Whenever municipal ordinances are printed in book or pamphlet form, and purport to be published by authority of the corporate authorities, *such book or pamphlet shall be prima facie evidence of the contents*, passage and legal publication of such ordinance, as of the dates mentioned in such book or pamphlet, in all courts and administrative tribunals.

65 Ill. Comp. Stat. § 5/1-2-6 (emphasis added). Christ Universal presented the district court with ample prima facie evidence that the CZO, as amended in February 2000, did not eliminate recreation buildings and community centers as permitted uses in M districts. It produced evidence of three different publications of the CZO that continued to list recreation buildings and community centers as allowed in M districts—the city council's own Journal of Proceedings, the CZO as published by Index Publishing Corporation, and the City of Chicago's Department of Zoning Web page.

The city council's Journal of Proceedings for February 16, 2000, as certified by the city clerk, reflects the passage of the CZO amendments and, according to the testimony of the deputy corporation counsel in charge of the legislative and intergovernmental division of the City of Chicago law department, generally is the document upon which the public can rely in determining the current state of the law. According to the deputy corporation counsel, the information contained in the Journal of Proceedings is supposed to include the amended articles in full, with additions in italicized print and deletions in brackets. In this circumstance, the Journal's publisher omitted any reference to subsection 12 of Article 10.3-1—the subsection referring to recreation buildings and community centers. Instead it showed only subsection 11a renumbered as subsection 12 and the deletion of subsection 13, referring to private clubs and lodges:

> SECTION 7. That Article 10.3-1 of the Chicago Zoning Ordinance, is hereby amended by deleting the language in brackets and adding the language in italics as follows:
>
> **10.3-1 Permitted Uses—M1-1 to M1-5 Restricted Manufacturing Districts.**
>
> The following uses are permitted in the M1-1 to M1-5 Districts inclusive . . . :
>
> \*\*\*
>
> *(12)*[(11a)] Medical and Dental Clinics. (Amend. Coun J. 7-9-58, p. 7996)
>
> [(12a) Private Clubs or Lodges. (Amend. Coun. J. 10-11-61, p. 5603)]

Journal of Proceedings of the City Council, The City of Chicago, Feb. 16, 2000, pp. 26011-13.[2]

Christ Universal also presented evidence that the book commonly relied upon by zoning practitioners continued to list recreation buildings and community centers as permitted uses in M districts after the passage of the CZO amendments. In the book, published by Index Publishing Corporation in 2001, former subsection 12 of Article 10.3-1, which, in the Journal of Proceedings was represented as being neither deleted nor added, but was simply absent, was added back in, but as subsection 12a:

> **10.3-1 Permitted Uses—M1-1 to M1-5 Restricted Manufacturing Districts.**
>
> The following uses are permitted in the M1-1 to M1-5 Districts inclusive . . . :
>
>           ***
>
> (12) Medical and Dental Clinics. (Amend. Coun. J. 7-9-58, p. 7996; 2-16-00, p. 25997.)

---

[2] The Journal of Proceedings should have read as follows:

*(12)*[(11a)] Medical and Dental Clinics. (Amend. Coun. J. 7-9-58, p. 7996)

[(12) Municipal or Privately-owned Recreation Buildings or Community Centers.]

[(12a) Private Clubs or Lodges. (Amend. Coun. J. 10-11-61, p. 5603)]

(App. to City's Supp. Br. in Opp. to the Church's Mot. for Prelim. Inj., Ex. H (Feb. 6, 2002 certified correction to the Journal of Proceedings of the City Council, The City of Chicago for Feb. 16, 2000, p. 26013); *see also* Def. Tr. Ex. 29(c).)

(12a) Municipal or Privately-owned Recreation Buildings or Community Centers. (Amend. Coun. J. 2-16-00, p. 25997.)

(13) Public Utility and Public Service Uses . . . .

Title 17 Municipal Code of Chicago, Chicago Zoning Ordinance, p. 71A (2001). The publisher attributes the re-numbering of what was formerly subsection 12 to subsection 12a to the CZO amendments passed February 16, 2000, as represented in the Journal of Proceedings of the City Council. *Id.*

Even more confusingly, the City of Chicago's own Department of Zoning Web page represented, as late as March 7, 2002, that recreation buildings and community centers remained as permitted uses, listing them under subsection 13, rather than either subsection 12 or 12a, with no attribution for the change in numbering:

**10.3-1 Permitted Uses—M1-1 to M1-5 Restricted Manufacturing Districts.**

The following uses are permitted in the M1-1 to M1-5 Districts inclusive . . . :

\*\*\*

(12) Medical and Dental Clinics. (Amend. Coun. J. 7-9-58, p. 7996; 2-16-00, p. 25997.)

(13) Municipal or Privately-owned Recreation Buildings or Community Centers.

(13a) Public Utility and Public Service Uses . . . .

(Rep. to City's Supp. Br. in Opp. to Church's Mot. for Prelim. Inj., Ex. B.) The City of Chicago zoning administrator explained, through affidavit, that the error in the electronic version was also the result of the misprint in the Journal of Proceedings. (*See* App. to City's Supp. Br. in Opp. to the Church's Mot. for Prelim. Inj., Ex. F, ¶¶ 6, 7.)

In response to this evidence, the City countered, through testimony and exhibits entered through its deputy corporation counsel, that the various published versions of Article 10.3-1 retaining recreation buildings and community centers as permitted M-district uses amounted to nothing more than an unfortunate scrivener's error. The deputy corporation counsel testified that the version actually adopted by the zoning committee, recommended for passage by the committee to the city council, and finally passed by the city council on February 16, 2000 contained the community-center deletion. He asserted that despite its mispublication, all amendments, including the deletion of subsection 12 of Article 10.3-1, were passed as of February 16, 2000 and effective March 14, 2000. Our painstaking review of the record convinces us that this is correct.

It is undisputed that the copy of MA-59, presented for passage to the zoning committee by the mayor's office, contained the deletion at issue. (See Def. Tr. Ex. 29a.) Tracing this document through the enactment process, with the aid of the unrefuted testimony of the deputy corporation counsel, we find that it was passed by the zoning committee without modification on January 25, 2000. The committee then recommended that the full city council adopt MA-59, which it did by a vote of 49 to 0 on February 16, 2000. After the city council's vote, the document was forwarded to the city clerk, who stamped it as being passed by the city council and deposited with the city clerk on February 16, 2000. (See Def. Tr. Ex. 29(c).) That document, retained in the city clerk's file, contains the community- center deletion. (*Id.*)

The deputy corporation counsel testified that after an ordinance is passed by the city council, the Mayor is given the opportunity to act on it. He has three options: he can (1) sign and return it to the city council, at which point it could become immediately effective; (2) return it to the city

council unsigned with his objections, at which point it is not effective; or (3) take no action, at which point it would be considered effective at the next city council meeting, as long as the meeting occurred more than five days after the prior meeting. Here, the Mayor took no action.

Although neither party presented specific evidence on this issue, we can reasonably infer that a copy of MA-59 as passed by the city council was forwarded to the Mayor, rather than another version of the ordinance amendments containing the misprint. The city clerk's certification, attached to the hard copy of MA-59 contained in his file, states that he delivered the ordinance to the Mayor "after the passage thereof by the said City council, *without delay*[.]" (See Def. Tr. Ex. 29(c) (emphasis added)). The other versions of the ordinance containing the misprint were produced some time after the passage of the ordinance, including the Journal of Proceedings, which was published on March 14, 2000, according to the deputy corporation counsel. Because the clerk received the original copy of MA-59 containing the community-center deletion and provided the ordinance "without delay" to the Mayor, and because no other version of the ordinance containing the misprint appears to have existed at the time, we conclude that the version the Mayor received and considered was the version containing the community-center deletion.

It is clear to us, therefore, that the city council and the Mayor intended to and did amend the CZO to include the community-center deletion as of the March 14, 2000 effective date. The misprints contained in the Journal of Proceedings, zoning book, and Department of Zoning Web page amount to nothing more than a scrivener's error. *See United States v. Gibson*, 356 F.3d 761, 766 n.3 (7th Cir. 2004) (defining scrivener's error as a synonym for "clerical error," meaning "a minor mistake or inadvertence, esp. in writing or copying something on the record . . ." (quoting

Black's Law Dictionary 563 (7th ed. 1999))). The district court abused its discretion in finding otherwise.

Our conclusion is further bolstered by three additional documents in the record. First, a letter from the managing editor of the Journal of Proceedings, dated September 21, 2001, acknowledges that the February 16, 2000 Journal entry recording the CZO amendments contained a printing error by failing to reflect the deletion of subsection 12, "as did the original document," and calling it an inadvertent omission. (*See* Def. Tr. Ex. 29d.)

Second, to correct the printing error, the city council did not vote again to amend Article 10.3.1 to exclude recreation buildings and community centers, as characterized by the district court. Rather, the city council simply approved a correction to the Journal at its regular meeting on February 6, 2002. (*See* App. to City's Supp. Br. in Opp. to the Church's Mot. for Prelim. Inj., Ex. H.) This indicates that the city council believed the amendments as passed on February 16, 2000 contained the community-center deletion and that the failure to note it in the Journal did not affect its efficacy.

Finally, the zoning administrator for the City of Chicago testified via affidavit that he understood the amendments to the CZO as passed February 16, 2000 to contain the community-center deletion. (*See* App. to City's Supp. Br. in Opp. to the Church's Mot. for Prelim. Inj., Ex. F, ¶¶ 3, 5.) He affirmed that since the CZO amendments' passage by the city council in February 2000, he has administered the CZO consistent with the language of MA-59 (*Id.* at ¶¶ 5, 8). We note that it does not appear, based on the evidence and briefing presented below, that any recreation or community

center attempted to locate in an M district after the February 2000 amendment prohibiting them.[3]

Because we find that CZO Article 10.3-1 was amended by the city council in February 2000 and in effect as of March 14, 2000, we also find, based on our holding in *CLUB*, *supra*, that the ordinance as amended was lawful at the time Christ Universal purchased its property in June 2000.

This is not to say, however, that the City is automatically off the hook. A city is estopped from enforcing an otherwise valid ordinance where its agents misinformed a party of the ordinance's substance, inducing conduct resulting in substantial loss. *See Cities Serv. Oil Co. v. City of Des Plaines*, 171 N.E.2d 605, 607-08 (Ill. 1961) (listing cases). As noted above, Christ Universal amply demonstrated that the City's representations to the public in the form of various printed and electronic versions of the ordinance was that recreation buildings and community centers continued to be allowed in M districts and churches were not. This would be a very different case if Christ Universal detrimentally relied on the published representations made by the City in choosing to purchase property in an M district. However, it did not, as the district court properly found.

In another vexing twist, the purchaser, Christ Universal's pastor, Roosevelt Simpkins, testified that at the time he closed on the property in June 2000, he believed that it was zoned B (business), not M. He acknowledged that churches

---

[3] We note, as well, that the district court deciding the *CLUB* case squarely faced this issue and specifically found that all amendments were enacted as of February 2000. *Civil Liberties for Urban Believers v. City of Chicago*, 2002 U.S. Dist. LEXIS 5913, *5 n.2 (N.D. Ill. Mar. 29, 2002). As mentioned previously, the parties to *CLUB* did not appeal that finding, so we did not pass on this issue in *CLUB*.

could not locate in B districts as of right, so that to operate at the chosen site, he would have to obtain a special use permit. It was only after he went to his alderman's office for help in acquiring the special use permit that he learned the property, which was formerly zoned B, had been "down zoned" to M almost a year prior. Unfortunately for Christ Universal, because it is clear that Pastor Simpkins did not rely on the misprinted version of the CZO in deciding to purchase the property, but rather on his mistaken belief that the property was zoned B, the church cannot support an estoppel argument.

In sum, we find that the CZO amendment removing recreation buildings and community centers as permitted uses in M districts was passed by the city council on February 16, 2000 and effective as of March 14, 2000—three months prior to Christ Universal's purchase of its property in June 2000. Our decision in *CLUB*, which upheld the February 2000 amendments, including the Article 10.3-1 amendment, as constitutional and in compliance with RLUIPA, thus forecloses Christ Universal's similar challenges here, which Christ Universal does not and cannot contest.[4] Because the church did not rely on the City's erroneous printing of the CZO in purchasing the property, the City is not estopped from enforcing what we have previously determined to be an otherwise lawful ordinance.

---

[4] *CLUB, supra*, was decided while the present appeal was pending, but after briefing was complete. The parties were invited to and did provide additional briefing discussing how our decision in that case impacted the present one. In its supplemental briefing, Christ Universal proceeds on the assumption that the city council did not effectively amend the CZO as of February 2000 and implicitly concedes that if all of the amendments were passed as of February 2000, *CLUB* forecloses its constitution- and RLUIPA-based claims.

### IV.  Conclusion

The district court abused its discretion in granting Christ Universal's request for a permanent injunction, and its decision is REVERSED and the injunction VACATED.


A true Copy:

    Teste:


                        _____
                        *Clerk of the United States Court of*
                        *Appeals for the Seventh Circuit*